**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number: 2018-NMSC-013

Filing Date: February 8, 2018

Docket No. S-1-SC-35477

STATE OF NEW MEXICO,

 Plaintiff-Appellee,

v.

NOE TORRES,

 Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Drew D. Tatum, District Judge**

McGarry Law Office
Kathleen McGarry
Glorieta, NM

for Appellant

Hector H. Balderas, Attorney General
Charles J. Gutierrez, Assistant Attorney General
Albuquerque, NM

for Appellee

**OPINION**

**DANIELS, Justice.**

**{1}** Defendant Noe Torres appeals his convictions of multiple offenses arising from a shooting into a home that missed the intended victim but resulted in the killing of a young boy. Among other questions he raises are several issues regarding the scope of constitutional double jeopardy protections against multiple punishments for the same offense. With regard to those double jeopardy issues, we hold that:

 (1) Conviction and punishment for both attempted murder of an intended victim and

1

a resulting murder of a different but unintended victim when the two crimes causing harm to the separate victims arise from the same act does not violate the double jeopardy clause;

(2) The double jeopardy clause does protect against multiple punishments for causing death or great bodily harm to a victim by shooting at a dwelling and for first-degree murder of the same victim when the same shooting caused the great bodily harm and the resulting death; and

(3) The double jeopardy clause also protects against multiple conspiracy convictions for entering into a single criminal conspiracy with objectives to commit more than one criminal offense.

**{2}**    We reject Defendant's other claims relating to alleged trial errors.

## I.    BACKGROUND

**{3}**    In the early hours of September 15, 2005, nine shots were fired through a bedroom window of an apartment in Clovis, killing ten-year-old Carlos Perez. Carlos had been sleeping in the bedroom he shared with his older brother, the intended victim, seventeen-year-old Ruben Perez.

**{4}**    That night there were two distinct groups of actors involved in the shooting: one group in a Suburban and the other in a Camry. The two groups converged at the apartment complex where the shooting took place. The Suburban group included Orlando Salas, Demetrio Salas, David Griego, and Melissa Sanchez. The Camry group included Defendant, Edward Salas, Krystal Anson, and Ashley Garcia.

**{5}**    The day before the shooting, an altercation between Orlando Salas and Ruben Perez took place at their high school. Later that night, in the early hours of September 15, Orlando and his older brother Demetrio picked up two friends, Melissa Sanchez and David Griego, in the Salas's blue and white Suburban. They pulled into an alleyway near the Gatewood Apartments where Ruben lived. Orlando and Demetrio said they wanted to get that "sewer rat," referring to Ruben.

**{6}**    Demetrio then drove to the house of a friend, Eric Gutierrez, that was near the Gatewood Apartments and dropped off Melissa and Orlando. Demetrio said he and David were "going to go do a mission" and left. About five minutes later Demetrio and David returned to Eric's house. Demetrio was described as "on an adrenaline rush" and holding a gun. Demetrio said, "We just went and blasted nine rounds into that sewer rat's house, pow, pow, pow, pow." Demetrio told Melissa not to touch him because he had gunpowder residue on him. Eric turned on his police scanner, and they heard that a child had been shot and that police were looking for a blue and white Suburban. Eric heard someone say, "Oh we got the wrong . . . guy."

**{7}**    On September 14, 2005, Defendant was with Krystal Anson, Ashley Garcia, and Edward Salas, the older brother of Demetrio and Orlando. Later, in the early hours of

September 15, Defendant, Krystal, Ashley, and Edward drove to the Gatewood Apartments in Krystal's white Camry. They parked the Camry on the street near the apartments. Defendant and Edward got out and ordered Krystal and Ashley to stay in the car.

**{8}** The Salas Suburban was parked down the street from the Camry. Two people got out of the Suburban and met Defendant and Edward at the apartment complex. Defendant, Edward, and the two from the Suburban shook hands and then disappeared from the sight of the Camry occupants.

**{9}** Krystal and Ashley got out of the Camry and walked to a nearby park. The girls were talking and smoking cigarettes at the park when they heard gunshots and ran back to the Camry. Defendant and Edward were also running to the Camry. When Defendant got to the car he was described as excited and smelling like "burned matches." Defendant got into the driver's seat of the Camry, Edward got into the front passenger seat, the girls got into the back seat, and they "took off." When Edward received a phone call, Defendant turned up the radio volume. Krystal heard Edward say to Defendant, "We didn't get him. We got the little boy," and then heard Defendant reply, "Are you sure it was the little boy?"

**{10}** The next day, Defendant went to the house of a girl he was dating. They packed bags and hurriedly left for Mexico. Two days after the murder, police obtained an arrest warrant for Defendant. Defendant was arrested more than six years later in Chihuahua, Mexico, and after another six months was brought back to New Mexico for trial.

**{11}** At Defendant's March 2015 trial, a crime scene expert testified that a shooter fired nine rounds into the bedroom window of the Perez residence and estimated that the shooter's position was two to three feet from the window. Additionally, a ballistics expert testified that the smell of gunpowder is similar to the smell of burned matches.

**{12}** The jury found Defendant guilty of shooting at a dwelling resulting in death or great bodily harm to Carlos, first-degree murder of Carlos, attempted first-degree murder of Ruben, conspiracy to commit first-degree murder, conspiracy to shoot at a dwelling, transportation of a firearm by a felon, and intimidation of a witness. At sentencing, the district court found Defendant to be a habitual offender and increased his sentence by three years. Defendant was sentenced to a total penitentiary term of life imprisonment plus thirty-one and one-half years.

**{13}** Defendant appealed his convictions to this Court. *See* N.M. Const. art VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."). He challenges his convictions on four grounds: (1) several of the convictions violated constitutional protections against double jeopardy, (2) the convictions were not supported by sufficient evidence, (3) the district court erred in not allowing him to cross-examine a witness regarding a prior bad act, and (4) his constitutional rights were violated when the district court did not allow him to attend sidebar conferences with his counsel and because he was shackled to the table during

3

trial. Defendant also contends that a time-barred prior felony was unlawfully used to impose a habitual offender sentence enhancement.

## II.    DISCUSSION

### A.    Double Jeopardy Challenges

**{14}** We first address Defendant's arguments that the following combinations of convictions constitute impermissible double jeopardy: (1) first-degree murder of Carlos and shooting at a dwelling resulting in death or great bodily harm to Carlos, (2) first-degree murder of Carlos and attempted first-degree murder of Ruben, and (3) conspiracy to commit first-degree murder and conspiracy to commit shooting at a dwelling.

**{15}** The double jeopardy protections of the United States Constitution and the New Mexico Constitution guarantee that a state may not compel a person to be "twice put in jeopardy" for the same criminal offense. U.S. Const. amend. V; *see* N.M. Const. art. II, § 15; *Benton v. Maryland*, 395 U.S. 784, 787, 793-94 (1969) (holding that the Fourteenth Amendment secures to defendants in state prosecutions the protections of the Double Jeopardy Clause of the Fifth Amendment, overruling *Palko v. Connecticut*, 302 U.S. 319 (1937)). Double jeopardy may result from (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *State v. Gallegos*, 2011-NMSC-027, ¶ 30, 149 N.M. 704, 254 P.3d 655 (internal quotation marks and citation omitted) (explaining that both the state and federal constitutions provide these three levels of protection).

**{16}** As to the third of those categories, there are two ways in which double jeopardy protections can be violated by multiple punishments. *State v. Bernal*, 2006-NMSC-050, ¶ 7, 140 N.M. 644, 146 P.3d 289. One is where a defendant suffers multiple punishments under the same statute for the same conduct, which presents a unit-of-prosecution issue. *Id.* The other is where a defendant is convicted under different statutes but the same criminal conduct is the basis underlying the multiple charges. *Id.* ¶¶ 7, 10. This latter category, termed a double-description violation, *id.*, is relevant to the issues we address in this case.

**{17}** A double jeopardy challenge presents a question of constitutional law, which we review de novo. *Gallegos*, 2011-NMSC-027, ¶ 51.

### 1.    The Double Jeopardy Clause Prohibits Multiple Punishments for Both Causing Death or Great Bodily Harm by Shooting into a Dwelling and First-Degree Murder for the Same Death

**{18}** In reviewing a double-description double jeopardy challenge, where a defendant's conduct violates more than one statute, we must first determine whether the defendant's conduct was unitary, requiring an analysis of whether or not a defendant's acts are separated by sufficient "indicia of distinctness." *State v. DeGraff*, 2006-NMSC-011, ¶¶ 26-27, 139

4

N.M. 211, 131 P.3d 61. If the conduct is not unitary, then there is no double jeopardy violation. *State v. Silvas*, 2015-NMSC-006, ¶ 9, 343 P.3d 616. If the conduct is unitary, we must determine whether the Legislature intended multiple punishments for the unitary action. *Id.*

**{19}** When determining whether a defendant's conduct is unitary "we have looked for an identifiable point at which one of the charged crimes had been completed and the other not yet committed. We have also looked for an event that intervened between the initial use of force and the acts that caused death." *DeGraff*, 2006-NMSC-011, ¶ 27 (citations omitted).

**{20}** The State concedes that Defendant's conduct was unitary with respect to the crimes of first-degree murder and shooting at a dwelling. Defendant's convictions arose from only one act, shooting through the Perez window. There was no identifiable point in time or intervening event between the completion of the shooting and the act causing the killing; they were one and the same. *See State v. Montoya*, 2013-NMSC-020, ¶ 30, 306 P.3d 426 ("[The d]efendant's act of shooting the driver of the [vehicle] was the common factual basis for both the shooting into the motor vehicle and the voluntary manslaughter convictions, and his culpable conduct was therefore 'unitary.'" (citation omitted)); *State v. Gutierrez*, 2011-NMSC-024, ¶¶ 2, 54, 150 N.M. 232, 258 P.3d 1024 (holding that the defendant's conduct underlying the convictions of both armed robbery and unlawful taking of a motor vehicle was unitary because both convictions were based on the conduct of stealing a car).

**{21}** When unitary conduct is the basis for multiple convictions, we must attempt to determine whether "the Legislature[] inten[ded] to punish the crimes separately." *State v. Swick*, 2012-NMSC-018, ¶ 11, 279 P.3d 747. "In analyzing legislative intent, we first look to the language of the statute itself." *Id.* If the Legislature clearly authorized multiple punishments the analysis is over, and there is no double jeopardy violation. *Gutierrez*, 2011-NMSC-024, ¶ 50. If the statutory language does not explicitly allow for multiple punishments, we apply canons of construction to determine legislative intent. *Swafford v. State*, 1991-NMSC-043, ¶¶ 12-13, 112 N.M. 3, 810 P.2d 1223 (discussing various canons of construction to determine legislative intent in a double jeopardy analysis, looking to the language, structure, and legislative history of the statutes and the social evils sought to be addressed by the statutes). If "the legislative intent remains ambiguous, the rule of lenity requires us to presume that the Legislature did not intend multiple punishments for the same conduct." *Swick*, 2012-NMSC-018, ¶ 13.

**{22}** The statute criminalizing shooting at a dwelling and causing great bodily harm provides, in pertinent part, "Whoever commits shooting at a dwelling or occupied building that results in great bodily harm to another person is guilty of a second degree felony." NMSA 1978, § 30-3-8(A) (1993); *see State v. Varela*, 1999-NMSC-045, ¶ 14, 128 N.M. 454, 993 P.2d 1280 (recognizing that the statutory element of great bodily harm could be established by proof of a death resulting from shooting into a dwelling). The murder statute provides, in pertinent part, "Murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may

5

be caused . . . by any kind of willful, deliberate and premeditated killing." NMSA 1978, § 30-2-1(A)(1) (1994).

**{23}** Because the statutes at issue in this case do not explicitly address allowance for multiple punishments when the conduct is unitary, we must apply canons of construction to try to ascertain the Legislature's intent.

**{24}** One of the canons of construction is what has been referred to in our jurisprudence as a modified *Blockburger* test, which originated with *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (announcing a simple test to determine whether there are single or multiple offenses: whether each criminal statute "requires proof of a fact which the other does not"). *See Montoya*, 2013-NMSC-020, ¶ 31 (observing that "[a]lthough the *Blockburger* test has the virtue of simplicity, it has been justly criticized as a mechanical test that compares statutory elements and is only sometimes related to substantive sameness" (internal quotation marks and citation omitted)). A literal application of the original *Blockburger* test would result in a determination that the multiple convictions in this case did not constitute double jeopardy because causing great bodily harm or death by shooting at a dwelling does not require the killing of a human being while the murder statute does not require shooting at a dwelling. But we have long rejected such a mechanical application. *See, e.g.*, *State v. Santillanes*, 2001-NMSC-018, ¶¶ 5, 24, 38, 130 N.M. 464, 27 P.3d 456 (recognizing that one death could result in only one homicide conviction under New Mexico law and holding that a defendant could not be punished separately for vehicular homicide and child abuse resulting in death, despite the fact that a mechanical application of the original *Blockburger* elements test would permit double punishment).

**{25}** In New Mexico, we now apply a modified *Blockburger* test to not only the defining statutes in the abstract but also to the State's theory of the particular case, because our law does not permit an application of *Blockburger* that is "so mechanical that it is enough for two statutes to have different elements." *Swick*, 2012-NMSC-018, ¶ 21 (explaining and applying the modified *Blockburger* test).

**{26}** In *Montoya* we held that convictions for causing great bodily harm to a person by shooting at a motor vehicle and the resulting homicide of the same person constituted double jeopardy when both convictions were based on the unitary conduct of shooting at a person in a motor vehicle. *See* 2013-NMSC-020, ¶ 54. While *Montoya* specifically addressed the shooting at a motor vehicle provision rather than the shooting at a dwelling provision at issue in the present case, these analogous subsections of the same statute, § 30-3-8, create similar offenses that address the same evil. Like the crime of shooting at a motor vehicle, the crime of shooting at a dwelling was enacted to protect against death and personal injury. *See Montoya*, 2013-NMSC-020, ¶¶ 44-45, 52. As we have recognized, the Legislature also enacted the murder statute to deter intentional infliction of serious personal injury. *See Swick*, 2012-NMSC-018, ¶ 29 ("[T]he attempted murder statute concerns itself with the intent to harm fatally.").

6

**{27}** This case is conceptually indistinguishable from *Montoya*. Because the crime of causing great bodily harm or death by shooting at a dwelling and the crime of murder are directed at punishing the same social evil, causing death or bodily harm to a person, we conclude for the reasons we set out in *Montoya* that the Legislature did not intend to subject Defendant to multiple punishments for the killing of a single victim. *See Montoya*, 2013-NMSC-020, ¶ 54; *see also Swick*, 2012-NMSC-018, ¶ 29 (holding that because both the attempted murder and the aggravated battery statutes "address the social evil of harmful attacks on a person's physical safety and integrity," convictions of both violate double jeopardy). We therefore hold that imposition of multiple punishments for the single death of Carlos Perez would constitute double jeopardy.

**{28}** When double jeopardy protections require one of two otherwise valid convictions to be vacated, we vacate the conviction carrying the shorter sentence. *See Montoya*, 2013-NMSC-020, ¶¶ 55-56 (avoiding violation of double jeopardy protections by vacating the conviction carrying the shorter sentence); *Swick*, 2012-NMSC-018, ¶ 31 (same). Because first-degree murder carries a life sentence, *see* NMSA 1978, § 31-18-14 (2009), and shooting at a dwelling with resulting death or great bodily harm carries a sentence of fifteen years imprisonment, *see* NMSA 1978, § 31-18-15(A)(4) (2007, amended 2016), we vacate Defendant's conviction for shooting at a dwelling.

2. **Defendant's First-Degree-Murder and Attempted-First-Degree-Murder Convictions Related to Different Victims Did Not Constitute Double Jeopardy**

**{29}** Defendant was convicted for murdering Carlos Perez and for attempting to murder Ruben Perez. He argues that these convictions of murder and attempted murder constitute double jeopardy because the conviction for murdering Carlos was based on "transferred intent." Defendant essentially contends that any intent applies to the conviction for murdering Carlos and cannot be used again to convict him for attempting to murder Ruben. We agree with the State that there is no double jeopardy violation because the number of murder convictions is dependent on the number of victims: Carlos was a victim of murder, and Ruben was a victim of attempted murder.

**{30}** "The doctrine of transferred intent is a legal fiction that is used to hold a defendant criminally liable to the full extent of his or her criminal culpability . . . where a defendant, while intending to kill one person, accidentally kills an innocent bystander or another unintended victim." *State v. Fekete*, 1995-NMSC-049, ¶ 21, 120 N.M. 290, 901 P.2d 708 (citation omitted). "Contrary to what its name implies, the transferred intent doctrine does not refer to any actual intent that is capable of being used up." *People v. Bland*, 48 P.3d 1107, 1113 (Cal. 2002) (internal quotation marks and citation omitted). The New Mexico murder statute incorporates the doctrine of transferred intent by not requiring proof of intent to kill a specific person. *See* § 30-2-1(A); *Fekete*, 1995-NMSC-049, ¶ 23.

**{31}** In *State v. Gillette*, the Court of Appeals upheld three counts of attempted first-degree murder, two counts based on a theory of transferred intent and one count for the attempt on

the intended victim. *See* 1985-NMCA-037, ¶¶ 38, 47-48, 102 N.M. 695, 699 P.2d 626. In "a bizarre and tangled scenario," the defendant attempted to kill the intended victim by anonymously leaving a poisoned soft drink for the victim at her workplace. *Id.* ¶¶ 2, 8. The intended victim and her two friends drank part of the poisoned drink. *Id.* ¶ 8. None of the three victims suffered any injury. *Id.* ¶ 46. The Court of Appeals held that a victim need not be injured for a defendant to be guilty of attempted murder and, because the defendant intended to kill the victim, that the "defendant's felonious intent to kill is transferred to others who foreseeably may also ingest the poison." *Id.* ¶¶ 45, 47.

**{32}**     *Gillette* is instructive. If one of the friends in *Gillette* had died, the defendant could have been convicted on one count of first-degree murder, predicated on transferred intent, and two counts of attempted murder for the victims who survived. Based on the reasoning in *Gillette*, a defendant can be convicted of attempted murder for the attempt to kill the intended victim and convicted of murder of additional victims who were actually killed, based on a theory of transferred intent.

**{33}**     In reviewing a unit-of-prosecution double jeopardy challenge, where an accused is convicted of multiple violations of a single statute, "the only basis for dismissal is proof that a suspect is charged with more counts of the same statutory crime than is statutorily authorized." *Bernal*, 2006-NMSC-050, ¶ 13. "The unit-of-prosecution analysis is done in two steps. First, we review the statutory language for guidance on the unit of prosecution. If the statutory language spells out the unit of prosecution, then we follow the language, and the unit-of-prosecution inquiry is complete." *Id.* ¶ 14 (citation omitted). If the statute is not clear, we must "determine whether a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments under the same statute." *Id.* (citation omitted).

**{34}**     Here we need not get past the first step in the unit-of-prosecution analysis because the murder statute is clear regarding the unit of prosecution. *See* § 30-2-1(A) ("Murder in the first degree is the killing of one human being by another . . . ."). The unit of prosecution under our murder statute depends on the number of victims, where one murder results in one murder charge and two murders result in two murder charges. *See id.* Because the unit of prosecution in the murder statute is clearly dependent on the number of victims, it follows that the Legislature intended the unit of prosecution for attempted murder to also depend on the number of victims targeted in the attempt. *See Bernal*, 2006-NMSC-050, ¶¶ 19, 31, 37 (looking to the robbery statute to determine the unit of prosecution for attempted robbery); *State v. Vega*, No. 33,363, dec. ¶ 60 (N.M. Sup. Ct. Jan. 9, 2014) (nonprecedential) (holding that the unit of prosecution for attempted first-degree murder is the same as that for murder). Because there were two victims in this case, the two convictions under Section 30-2-1(A)(1) for the crimes committed against each victim do not constitute multiple punishments for the same offense in violation of double jeopardy protections. Accordingly, we affirm Defendant's convictions of the attempted murder of Ruben Perez and the murder of Carlos Perez.

**3.        Multiple Convictions of Conspiracy to Commit First-Degree Murder and**

8

**Conspiracy to Shoot at a Dwelling Based on a Single Conspiratorial Agreement Constitute Double Jeopardy**

**{35}** Defendant was convicted of conspiracy to commit first-degree murder and conspiracy to shoot at a dwelling in an attempt to commit the murder. The district court merged these two conspiracy convictions by imposing one sentence for the two. Defendant argues that his multiple conspiracy convictions constitute double jeopardy because the State failed to prove two separate conspiracies and contends that the district court's merging of the sentences did not cure the double jeopardy violation. Defendant is correct.

**{36}** In *Gallegos*, 2011-NMSC-027, ¶¶ 1, 34, we addressed the problem of splitting a conspiratorial agreement into multiple charges of conspiracy based simply on the number of crimes contemplated in the conspiracy. We observed that "[w]here there is one agreement to commit two or more criminal acts, the perpetrators are guilty of a single conspiracy" and accordingly that "the number of agreements to break the law determines the number of criminal conspiracies subject to prosecution." *Id.* ¶ 34 (internal quotation marks and citation omitted).

**{37}** To avoid imposing multiple punishments for what in reality is often one criminal conspiratorial agreement with multiple objectives, we held in *Gallegos* that "[t]he Legislature established . . . a rebuttable presumption that multiple crimes are the object of only one, overarching, conspiratorial agreement subject to one, severe punishment set at the highest crime conspired to be committed." *Id.* ¶ 55. "[T]he state has an opportunity to overcome the Legislature's presumption of singularity, but doing so requires the state to carry a heavy burden." *Id.*

**{38}** In *Gallegos*, the defendant was convicted of three conspiracy charges: conspiracy to commit first-degree murder, conspiracy to commit aggravated arson, and conspiracy to commit kidnaping. *Id.* ¶ 27. All the conspiracy convictions arose from attempts by the defendant and several others to kill the victim. *Id.* ¶¶ 8-14, 57. The evidence that the crimes were committed in a relatively short period of time, were continuous, and were undisturbed by an intervening event strongly supported the conclusion that the defendant and his coconspirators formed only one overarching agreement rather than three separate agreements. *Id.* ¶ 60. Accordingly, we held that the state had established only a single conspiracy to kill. *Id.* ¶ 64.

**{39}** In the present case, the State presented no evidence to rebut the presumption that the agreement to murder Ruben Perez and the agreement to shoot at a dwelling to accomplish that goal were the objects contemplated by one conspiratorial crime. Accordingly, the State has conceded on appeal that Defendant should be convicted of one conspiracy, rather than two. We agree that the evidence supports the conclusion that there was only one conspiracy, the conspiracy to murder Ruben Perez by shooting into his bedroom.

**{40}** New Mexico law is also clear that a double jeopardy violation is not cured by

9

merging multiple convictions for concurrent sentencing. *See id.* ¶ 64 ("[D]ouble jeopardy problems are not cured by the trial court imposing concurrent sentences for the multiple convictions . . . ." (internal quotation marks and citation omitted)). "[T]he appropriate remedy is to vacate [the d]efendant's redundant convictions with punishment imposed on the single remaining conspiracy at the level of the highest crime conspired to be committed." *Id.* (internal quotation marks and citation omitted). Accordingly, we vacate Defendant's conviction of conspiracy to shoot at a dwelling.

## B.     Sufficiency of the Evidence Challenges

**{41}**     Defendant contends that his convictions are not supported by sufficient evidence. We address sufficiency of the evidence for the convictions that we have not already determined should be vacated on double jeopardy grounds.

**{42}**     In reviewing for sufficiency of the evidence, we must determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rinker v. State Corp. Comm'n*, 1973-NMSC-021, ¶ 5, 84 N.M. 626, 506 P.2d 783. "[W]e must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.

## 1.     Sufficient Evidence Supports Defendant's Convictions of Attempted First-Degree Murder of Ruben Perez and First-Degree Murder of Carlos Perez

**{43}**     We address Defendant's contention that there is insufficient evidence to prove he had the requisite mens rea for first-degree murder and attempted first-degree murder, either as a principal or as an accessory. The requisite mens rea for each of these crimes is deliberate intent to murder. *See* § 30-2-1(A)(1); NMSA 1978, § 30-28-1 (1963); UJI 14-201 NMRA; UJI 14-2801 NMRA. "A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201.

**{44}**     "In New Mexico, [a] person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission . . . although he d[oes] not directly commit the crime . . . ." *State v. Carrasco*, 1997-NMSC-047, ¶ 6, 124 N.M. 64, 946 P.2d 1075 (internal quotation marks and citation omitted). A person who is an accessory to a crime is equally culpable and subject to the same punishment as the principal actor. *Id.* "The evidence of aiding and abetting may be as broad and varied as are the means of communicating thought from one individual to another; by acts, conduct, words, signs, or

10

by any means sufficient to incite, encourage or instigate commission of the offense." *State v. Ochoa*, 1937-NMSC-051, ¶ 31, 41 N.M. 589, 72 P.2d 609. A defendant's "mere presence without some outward manifestation of approval is insufficient" to uphold a conviction on a theory of accessory liability. *State v. Salazar*, 1967-NMSC-187, ¶ 4, 78 N.M. 329, 431 P.2d 62. In addition to aiding and abetting, to be convicted of the crime the accessory must "share the criminal intent of the principal . . . ." *State v. Marquez*, 2010-NMCA-064, ¶¶ 9, 13, 148 N.M. 511, 238 P.3d 880 (stating that the requisite mens rea for homicide or great bodily injury by vehicle is conscious wrongdoing and that in order to prove accessory liability for this crime, "it would be necessary for the [s]tate to demonstrate that [a d]efendant encouraged and shared the intent of conscious wrongdoing with [the principal actor]").

**{45}**   Defendant argues that his case is controlled by *State v. Vigil*, where we held that the defendant's first-degree murder conviction was not supported by substantial evidence. *See* 2010-NMSC-003, ¶¶ 1, 4, 147 N.M. 537, 226 P.3d 636. In *Vigil*, the jury found the defendant guilty of first-degree murder on a theory of accessory liability. *Id.* ¶ 1. The victim owed the defendant's cousin money, which precipitated an altercation between the defendant and the victim. *Id.* ¶ 6. Later that day, the victim and the defendant showed up in separate vehicles at the residence of the defendant's girlfriend. *Id.* ¶¶ 7-9. The defendant, angered that the victim was at his girlfriend's residence, got out of his vehicle in a rage and punched the victim twice through the open window of the victim's car. *Id.* ¶ 10. The victim shot the defendant and sped off. *Id.* ¶¶ 10-11. The defendant fell to the ground and remained there until he was taken to the hospital. *Id.* ¶ 10. As the victim was driving away, the defendant's cousin and two others appeared at the scene and fired shots into the victim's retreating vehicle, killing the victim. *Id.* ¶ 11. We held that there was insufficient evidence to uphold the defendant's conviction of first-degree murder under a theory of accessory liability. *Id.* ¶¶ 22-23. The defendant was incapacitated at the time the principal actor formed the requisite intent, and the defendant had not participated in planning the killing and did not help or encourage the principal in any way. *Id.* ¶¶ 19-21.

**{46}**   In this case the record contains sufficient evidence to support a jury finding that Defendant had the deliberate intent to kill Ruben and that he helped in the planning of the crime. Defendant spent the day before the murder with Edward, who had a motive to kill Ruben. *See State v. Motes*, 1994-NMSC-115, ¶¶ 12, 14-15, 118 N.M. 727, 885 P.2d 648 (considering motive in assessing whether the defendant had the deliberate intent to kill). Defendant secured for himself and Edward a ride in the Camry to the apartment complex where Ruben lived where the two got out of the Camry, shook hands with those in the Suburban group in front of the apartment building, and disappeared from sight with the other two shortly before gunshots were heard. From this, a jury could reasonably infer that Defendant aided and abetted in the plan to kill Ruben.

**{47}**   There also was sufficient evidence that Defendant actively participated in the actual attempt to kill Ruben. The lethal weapon was fired two to three feet from Ruben's bedroom window, and after the shots were fired Defendant returned to the Camry in an excited state,

11

smelling like burned matches. From this evidence the jury could draw a reasoned inference that Defendant had been involved in the shooting, had been outside the bedroom window in very close physical proximity to the murder weapon, and had shared the deliberate intent to murder Ruben. *See State v. Griffin*, 1993-NMSC-071, ¶ 25, 116 N.M. 689, 866 P.2d 1156 (holding that evidence of the defendant shooting the victim at close range supported the jury's finding that the defendant had the deliberate intent to murder the victim); *see also State v. Treadway*, 2006-NMSC-008, ¶ 10, 139 N.M. 167, 130 P.3d 746 (same).

**{48}** Once in the Camry, Edward said to Defendant after receiving a phone call, "We didn't get him. We got the little boy." Defendant replied, "Are you sure it was the little boy?" The exchange between Edward and Defendant provides further support for the jury's finding that Defendant shared the deliberate intent to murder Ruben.

**{49}** Because there was sufficient evidence to support the jury's finding that Defendant had the requisite deliberate intent to kill required for his convictions of first-degree murder and attempted first-degree murder, we affirm those convictions.

**2.      Sufficient Evidence Supports Defendant's Conviction of Conspiracy to Commit First-Degree Murder**

**{50}** Defendant also challenges the sufficiency of the evidence to support his conviction of conspiracy to commit first-degree murder. "Conspiracy consists of knowingly combining with another for the purpose of committing a felony." NMSA 1978, § 30-28-2 (1979). "An overt act is not required and the crime of conspiracy is complete when the felonious agreement is reached." *State v. Lopez*, 2007-NMSC-049, ¶ 21, 142 N.M. 613, 168 P.3d 743 (internal quotation marks and citation omitted). "The jury may therefore infer the existence of an agreement based on the defendant's conduct and surrounding circumstances . . . ." *Gallegos*, 2011-NMSC-027, ¶ 45. "Conspiracy is seldom susceptible of direct proof and is usually established by inference from the conduct of the parties. A formal agreement need not be proved; a mutually implied understanding is sufficient to establish the conspiracy." *State v. Dressel*, 1973-NMCA-113, ¶ 4, 85 N.M. 450, 513 P.2d 187 (citation omitted).

**{51}** There is sufficient evidence to support the jury's finding that Defendant conspired with others to commit murder. In this case, the evidence that supports Defendant's conviction of first-degree murder also supports the jury's finding that Defendant was part of a conspiracy to commit first-degree murder. Defendant was with Edward the day before the shooting, he secured a ride to the Gatewood Apartments for himself and Edward, they arrived at the apartment complex at the same time as the Suburban group, he shook hands with the persons from the Suburban group before shots were heard, he went to the shooting scene before the shots were fired, he ran back from the scene smelling like "burned matches" immediately after the shots were fired, and when Edward informed Defendant that they shot the wrong person, Defendant asked Edward if he was sure. From this evidence a reasonable, or reasoning, jury could find that Defendant was part of an agreement with one or more others to murder Ruben. *See State v. Flores*, 2010-NMSC-002, ¶¶ 2-3, 22, 147 N.M. 542,

226 P.3d 641.

### 3. Sufficient Evidence Supports Defendant's Conviction of Unlawful Transportation of a Firearm

**{52}** Defendant argues that there is insufficient evidence that he was in unlawful possession of a firearm in violation of NMSA 1978, Section 30-7-16 (2001). Defendant concedes that he was a felon at the time of the charged offenses but contends that there is insufficient evidence to prove he received or possessed a firearm.

**{53}** Defendant overlooks the fact that the statute also prohibits a felon from transporting a firearm. *See* § 30-7-16(A) ("It is unlawful for a felon to receive, *transport* or possess any firearm or destructive device in this state." (emphasis added)). Transportation of a firearm is a general intent crime and does not require proof of the felon's intent to violate the law for conviction. *State v. Dunsmore*, 1995-NMCA-012, ¶¶ 4, 6-7, 119 N.M. 431, 891 P.2d 572. A felon's knowing act of transporting a firearm is enough to violate the law. *Id.* ¶ 7.

**{54}** There is sufficient evidence that Defendant knowingly transported a firearm. Although Defendant's trial version of the day of the offenses varies greatly from the other witnesses' versions, he acknowledged in his trial testimony that on September 14, 2005, he was driving Edward around town and was aware that Edward had brought a gun into the car. Because of Defendant's admission alone, there is sufficient evidence for a jury to find that Defendant transported a firearm. *See Dunsmore*, 1995-NMCA-012, ¶ 8 (upholding a conviction for a felon unlawfully transporting a firearm when the defendant transported a person he knew to be in possession of a gun). Accordingly, we affirm Defendant's conviction for transporting a firearm.

### C. The District Court's Disallowing Impeachment of a Witness Regarding a Prior Bad Act Is Not Grounds for Reversal

**{55}** Defendant argues that the trial court erred when it denied Defendant the opportunity to cross-examine a State's witness, Keith Farkas, regarding a prior bad act that was probative of the witness's character for truthfulness. The State contends that the district court did not commit error, and even assuming error, any error under the circumstances was harmless.

**{56}** Farkas had been a detective with the Clovis Police Department and conducted the crime scene investigation on the Camry and the Suburban. In 2006, Farkas was accused of stealing a work computer. Criminal charges were brought and later dropped, but because of the criminal charges he was dismissed from the Clovis Police Department. Defendant wanted to cross-examine Farkas regarding this alleged theft and argued that the evidence was admissible because it went to Farkas' credibility and trustworthiness. The State argued that the impeachment should be precluded for its lack of substantial probative value under the discretion afforded a trial court by Rule 11-403 NMRA, which provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of

13

one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The district court excluded the evidence.

**{57}** Under Rule 11-608(B)(1) NMRA "A party may . . . inquire into particular instances of a witness's conduct on cross-examination . . . providing the conduct is probative of truthfulness or untruthfulness." *State v. Casillas*, 2009-NMCA-034, ¶ 43, 145 N.M. 783, 205 P.3d 830. "Questions concerning embezzlement, burglary, auto theft and larceny involve dishonesty, [a]re probative as to truthfulness and [a]re proper [for] cross-examination under Evidence Rule 608(b)." *State v. Wyman*, 1981-NMCA-087, ¶ 10, 96 N.M. 558, 632 P.2d 1196.

**{58}** While Rule 11-608 specifically allows the court to permit cross-examination on prior specific acts relating to a witness's character for truthfulness, the language in the rule is permissive, not mandatory. *See* Rule 11-608(B)(1) ("[T]he court *may*, on cross-examination, allow [specific instances of a witness's character for truthfulness] to be inquired into . . . ." (emphasis added)). Because the language in the rule is permissive, the district court did not abuse its discretion when it did not allow Defendant to cross-examine the witness regarding the specific prior dishonest act. *See Segura v. K-Mart Corp.*, 2003-NMCA-013, ¶ 28, 133 N.M. 192, 62 P.3d 283 (observing that under Rule 11-608, "even though such evidence may be relevant, its admissibility is left to the sound discretion of the trial court").

**{59}** On this record, there is no showing the district court abused the judicial discretion provided by either Rule 11-608 or 11-403. Farkas's credibility was not probative of any important issue in the case. Farkas testified only that the evidence collected from the vehicles, consisting of fingerprints, hair, and gunshot residue, produced no conclusive results as to the vehicles' occupants. His testimony provided very little, if any, incriminating evidence against Defendant. Defendant would not have gained anything by impeaching Farkas's character for truthfulness.

**{60}** Because the district court did not abuse its discretion and because Defendant was not prejudiced in any material respect by the district court's exclusion of the minimally relevant impeachment evidence, the district court's ruling does not warrant reversal.

**D. Shackling Defendant During Trial Was Not Fundamental Error**

**{61}** We address Defendant's contention that he was denied a fair trial because he was "chained to the table" throughout his trial without a hearing to determine whether shackling was appropriate. Defendant neither objected to the shackling in the district court nor requested a hearing to consider whether shackling was justified.

**{62}** Because Defendant did not preserve this issue for appeal, we review for fundamental error. *State v. Johnson*, 2010-NMSC-016, ¶ 25, 148 N.M. 50, 229 P.3d 523 (holding that because the defendant did not object to the use of leg irons during trial, this Court reviewed

14

the issue for fundamental error). Fundamental error "goes to the foundation or basis of a defendant's rights or . . . take[s] from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive" and "only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience to allow the conviction to stand." *Cunningham*, 2000-NMSC-009, ¶ 13 (internal quotation marks and citations omitted).

**{63}** In *Johnson* we recognized that "'the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial[,]' including security concerns." *Johnson*, 2010-NMSC-016, ¶ 26 (alteration in original) (quoting *Deck v. Missouri*, 544 U.S. 622, 635 (2005)). But we pointed out that "where a defendant is restrained in a manner not visible to the jury, prejudice is not presumed." *Johnson*, 2010-NMSC-016, ¶ 28.

**{64}** In this case, there is nothing in the record that reflects that the shackles could be seen by the jury. There were only three instances when defense counsel even mentioned Defendant's shackles to the judge, and in none of those instances did defense counsel indicate that the shackles could be seen by the jury. First, defense counsel noted during a whispered sidebar conference that Defendant was shackled and could not attend. Second, after the jury was released for lunch, defense counsel asked if Defendant could be unshackled during the lunch break so he could make notes pertaining to afternoon witnesses. The judge denied this request, noting that Defendant's shackles did not prevent him from making notes. Third, defense counsel requested Defendant's shackles be removed before the jury was brought in one morning because Defendant would be the first to testify that day, and the judge granted this request. This last instance indicates that the district court actually took steps to ensure that the jury did not see Defendant in shackles, minimizing any risk of prejudice. As we concluded in analogous circumstances in *Johnson*, where there was no showing the jury had seen the defendant's shackles, we conclude that "the district court did not commit fundamental error by keeping [the d]efendant in shackles for the duration of the trial." *Id.* ¶ 29.

**{65}** Because there was no fundamental error in shackling Defendant in a manner not visible to the jury, we have no need to address the question whether Defendant's history of flight to avoid prosecution or any other particular considerations would have supported the court's exercise of discretion in ordering leg restraints during trial.

**E.     Defendant Was Not Denied a Fair Trial by the Court's Refusal to Permit Him to Join His Counsel at Sidebar Conferences**

**{66}** Defendant argues that his shackling made it impossible for him to attend sidebar conferences during trial and suggests that this violated his constitutional right to counsel by preventing him from communicating with his lawyer. Defendant cites two United States Supreme Court cases in support of this argument, neither of which addresses the sidebar

15

issue: *Gideon v. Wainright*, 372 U.S. 335, 339-40 (1963) (interpreting the Sixth Amendment to mean that "counsel must be provided for defendants unable to employ counsel unless the right is competently and intelligently waived."), and *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (emphasizing that courts should refrain from binding and gagging defendants unless absolutely necessary to honor "one of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel"). The district court held that because Defendant was represented by counsel and his counsel attended the sidebar conferences, Defendant did not have a right to join his counsel for the sidebars. We agree.

**{67}**　Defendant was represented by his attorney at all sidebar conferences. *See United States v. McCoy*, 8 F.3d 495, 496-97 (7th Cir. 1993) (holding that the defendant's interests were adequately protected by his counsel's presence at the conference and that the defendant's "absence from the conferences did not detract from his defense or in any other way affect the fundamental fairness of his trial"). Defendant alleges no specific time when the shackles prevented him from communicating with counsel.

**{68}**　No New Mexico or United States Supreme Court precedent establishes a defendant's right to join his counsel at a sidebar conference during trial. The United States Supreme Court has held that a defendant has a right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge" and when the defendant's presence "is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Snyder v. Massachusetts*, 291 U.S. 97, 105-08 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964); *see also Faretta v. California*, 422 U.S. 806, 819 n.15 (1975) ("[A]n accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."). While "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure," *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), it is the defendant's burden to show the critical nature of his absence, *see id.* at 747.

**{69}**　The only sidebar conference when defense counsel actually objected to Defendant's absence was called to address defense counsel's objection on foundational grounds to admission of a gun offered as an evidentiary exhibit. The judge deferred a ruling on the objection at the sidebar conference, the State then provided the necessary foundation in open court, and Defendant stipulated to the gun's admission after conferring with his attorney. Defendant has articulated no reason why his absence from this sidebar conference or any other adversely affected his ability to communicate with his counsel or to defend himself.

**{70}**　We conclude that Defendant has failed to establish that his inability to join his counsel at routine sidebar conferences adversely affected his right to a fair trial or any other constitutional rights.

**F.　The District Court Erred in Enhancing Defendant's Sentence Pursuant to the Habitual Offender Statute When More Than Ten Years Had Elapsed Between**

16

**Defendant's Discharge on the Earlier Offense and the Date of Actual Conviction of the Current Offense**

**{71}** Defendant argues that his sentence should not have been enhanced pursuant to the habitual offender statute because more than ten years had elapsed between Defendant's discharge from probation for his prior felony conviction and the date of conviction in the current case. The State concedes that the district court erred in application of the habitual offender statute, NMSA 1978, § 31-18-17(A) (2003).

**{72}** The habitual offender statute defines "prior felony conviction" as "a conviction, when less than ten years have passed prior to the *instant felony conviction* since the person completed serving his sentence or period of probation or parole for the prior felony, whichever is later . . . ." Section 31-18-17(D)(1) (emphasis added). The habitual offender statute textually calculates felon status based on the date of the current felony conviction, not the date of the criminal offense. While questions may be raised about the policy considerations in allowing delays in conviction to change the sentence for a criminal offense, particularly in cases like this where Defendant has reduced his sentence through his time as a fugitive from justice, those are issues for the Legislature to consider. Because "[i]t is the particular domain of the legislature, as the voice of the people, to make public policy," changes in the scope of statutes is a subject for "legislative therapy, not judicial surgery." *State ex rel. N.M. Judicial Standards Comm'n v. Espinosa*, 2003-NMSC-017, ¶ 36, 134 N.M. 59, 73 P.3d 197 (Serna, J., specially concurring) (internal quotation marks and citations omitted).

**{73}** Looking at the relevant dates in this case, Defendant's probation for his prior felony expired on September 25, 2004, by a court's order of unsatisfactory discharge. The date of the conviction in this case was March 13, 2015. Because Defendant completed his probation for the prior felony conviction more than ten years before the date of conviction in the current case, we agree with the State's concession that the district court erred in using the prior felony conviction as a predicate felony to enhance Defendant's sentence. Accordingly, we vacate the three-year sentence enhancement.

## III.    CONCLUSION

**{74}** We affirm Defendant's convictions of first-degree murder, attempted first-degree murder, and conspiracy to commit first-degree murder. We reverse his convictions for shooting at a dwelling and conspiring to shoot at a dwelling, and we vacate the habitual offender enhancement of his sentence. We remand this case to the district court for entry of an amended judgment and sentence in accordance with this opinion.

**{75}    IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____

**JUDITH K. NAKAMURA, Chief Justice**


_____

**PETRA JIMENEZ MAES, Justice**


_____

**EDWARD L. CHÁVEZ, Justice**


_____

**BARBARA J. VIGIL, Justice**