# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: _____**

**Filing Date: December 27, 2018**

**NO. S-1-SC-36229**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**ANDREW ROMERO,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**George P. Eichwald, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Martha Anne Kelly, Assistant Attorney General
Anita Carlson, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**CLINGMAN, Justice.**

{1}     Defendant Andrew Romero appeals his convictions arising from the shooting death of Rio Rancho Police Officer Gregg Nigel Benner during a traffic stop. Defendant was convicted of first-degree murder under NMSA 1978, Section 30-2-1(A)(1) (1994); two counts of tampering with evidence under NMSA 1978, Section 30-22-5 (2003); shooting at or from a motor vehicle under NMSA 1978, Section 30-3-8(B) (1993); conspiracy to commit armed robbery under NMSA 1978, Section 30-28-2 (1979) and NMSA 1978 Section 30-16-2 (1973); aggravated fleeing a law enforcement officer under NMSA 1978, Section 30-22-1.1 (2003); and concealing identity under NMSA 1978, Section 30-22-3 (1963). The sentencing jury found aggravating circumstances in Defendant's first-degree murder conviction because Defendant murdered Officer Benner when Officer Benner was acting in the lawful discharge of an official duty and Defendant knew Officer Benner to be a peace officer at the time of the crime. NMSA 1978, § 31-20A-5(B) (1981). For his crimes, the trial court sentenced Defendant to life in prison without the possibility of parole plus sixty years. Defendant appeals directly to this Court. *See* N.M. Const. art. VI, § 2; Rule 12-102(A)(1) NMRA (requiring that appeals from sentences of life imprisonment be taken to the Supreme Court).

{2} Defendant raises eleven issues on appeal: (1) the trial court erred by not transferring venue outside of the Albuquerque metropolitan area; (2) the trial court erred by not excusing for cause those jurors who were exposed to publicity about the case; (3) the presence of excessive security during the trial prejudiced Defendant; (4) the trial court erred in admitting evidence of uncharged robberies; (5) the trial court should have ordered severance of count five, conspiracy to commit armed robbery; (6) the trial court erred in admitting a video recording of Defendant's nonverbal gestures; (7) the trial court erred in admitting a recording of Defendant's jail telephone call; (8) cumulative error deprived Defendant of a fair trial; (9) Defendant's conviction of shooting at or from a motor vehicle constitutes double jeopardy; (10) the State failed to prove the essential elements of aggravated fleeing; and (11) the State failed to prove deliberate intent, an element necessary to maintain Defendant's first-degree murder conviction. We affirm all of Defendant's convictions except for his conviction of shooting at or from a motor vehicle, which we vacate on double jeopardy grounds.

**I.    BACKGROUND**

{3} Officer Benner was shot and killed during a routine traffic stop at approximately 8 p.m. on May 25, 2015. Officer Benner had initiated the traffic stop

2

of a Dodge Durango because it had a suspicious license plate. Officer Benner initially pulled the Durango over in a parking lot next to Arby's on Southern and Pinetree in Rio Rancho. Tabitha Littles drove the Durango, and a passenger in the vehicle identified himself to Officer Benner as Albert Fresquez. Witnesses later identified Defendant as this passenger. Unbeknownst to Officer Benner, approximately seven hours before the traffic stop, Defendant and Ms. Littles had robbed a Taco Bell in Albuquerque. Officer Benner's traffic stop was unrelated to the Taco Bell robbery.

{4}      During this initial traffic stop Officer Benner moved to the rear of the Durango, and, as he began approaching the passenger side, the Durango suddenly accelerated out of the parking lot. While Officer Benner was moving around the Durango, Defendant removed his pistol from under his seat and was holding it between his seat and the center console of the vehicle. Officer Benner pursued the fleeing Durango and caught up to it a short distance away. During the short pursuit, Defendant shoved Ms. Littles out of the Durango, took control of the vehicle, and then brought the vehicle to a stop. As Officer Benner again approached the Durango, this time on the driver side, Defendant fired his pistol four times. All four bullets struck Officer Benner, and he was mortally wounded. Defendant then fled from the scene in the Durango. A multiagency, city-wide manhunt ensued.

{5}    At 2:40 a.m. on May 26, 2015, approximately six and a half hours after Defendant shot Officer Benner, Defendant robbed a Shell/Giant gas station. While investigating that robbery, police officers attempted to stop a Chevrolet Impala fleeing from police. During the pursuit, officers observed an object being thrown from the front passenger window. When the chase ended, police found Defendant sitting in the front passenger seat of the Impala and arrested him. Officers recovered the object that was thrown from the front passenger window of the Impala during the chase. It was a nine millimeter Beretta pistol which was later determined to be the pistol used to kill Officer Benner. Defendant's DNA was found on the pistol. When officers searched Defendant, they found the keys to the Dodge Durango that Officer Benner had pulled over and which had fled the scene of his murder.

{6}    On June 11, 2015, a grand jury indicted Defendant on ten counts related to Officer Benner's murder. On October 3, 2016, a jury found Defendant guilty of seven of those counts. The trial court sentenced Defendant to life in prison without parole plus sixty years. This direct appeal followed Defendant's sentencing. Additional facts will be provided as necessary in the discussion below.

**II.    DISCUSSION**

**A.    The Trial Court's Decision to Change Venue to Valencia County**

4

{7}     Media coverage of this case was robust and almost entirely negative toward Defendant. Politicians and the public used Defendant and the murder of Officer Benner as a rallying cry for anticrime legislation. Because of the extensive media coverage, Defendant filed a motion to change venue to Rio Arriba County, McKinley County, or Taos County. The trial court granted Defendant's motion to change venue but moved the trial to Valencia County. The trial court concluded that Valencia County was an appropriate venue, and cited public excitement in Sandoval County as reason for the move. *See* NMSA 1978, § 38-3-3(B)(3) (2003) (requiring a change of venue upon motion if, 'because . . . of public excitement . . . involved in the case, an impartial jury cannot be obtained in the county to try the case'). Although the trial court's final ruling on venue did not move the trial to one of the three counties Defendant requested in his written motion, defense counsel suggested during a pretrial hearing on the motion that Valencia County was an acceptable alternative.

{8}     The trial court summoned 800 prospective jurors, and 300 of those prospective jurors filled out a special questionnaire. The trial court ultimately assembled 150 people for the venire. At the conclusion of voir dire, Defendant renewed his motion to change venue. The trial court denied Defendant's renewed motion.

{9}     For the reasons that follow, Defendant's argument that the trial court erred

5

when it initially moved the venue to Valencia County is rendered moot because an impartial jury was actually seated. This Court needs only to address the trial court's decision to keep the trial in Valencia County following jury selection.

**1.      Standard of Review**

{10}      We review the trial court's venue determination for abuse of discretion. *State v. House*, 1999-NMSC-014, ¶ 31, 127 N.M. 151, 978 P.2d 967. If the trial court denies a motion to change venue based on presumed prejudice and proceeds with voir dire, "we will limit our review to the evidence of actual prejudice." *State v. Barrera*, 2001-NMSC-014, ¶ 16, 130 N.M. 227, 22 P.3d 1177. The determination of "[a]ctual prejudice requires a direct investigation into the attitudes of potential jurors." *House*, 1999-NMSC-014, ¶ 46. "A finding of no actual prejudice following voir dire, if supported by substantial evidence, necessarily precludes a finding of presumed prejudice." *Barrera*, 2001-NMSC-014, ¶ 16. To prove that reversible error occurred during voir dire, Defendant must show that the trial court abused its discretion by not excusing a juror who demonstrated actual prejudice. *See Fuson v. State*, 1987-NMSC-034, ¶¶ 8, 11, 105 N.M. 632, 735 P.2d 1138. The trial court's decision to wait until after voir dire to rule on a motion to change venue is squarely within the trial court's discretion and will only be reviewed for an abuse of discretion.

6

*Barrera,* 2001-NMSC-014, ¶ 16. The party that opposes the trial court's venue decision bears the burden of proving an abuse of discretion. *House*, 1999-NMSC-014, ¶ 31.

**2.      The Trial Court Did Not Abuse Its Discretion By Holding the Trial in Valencia County Because the Selected Jurors Demonstrated No Actual Prejudice**

{11}     After voir dire was complete and a jury was selected, the trial court reconsidered venue in Valencia County on Defendant's renewed motion to change venue. At that time the trial court not only had the evidence Defendant provided concerning media saturation but also the attestations of the jurors who would actually hear the case. Voir dire revealed no actual prejudice in the jury selected.

{12}     During voir dire, the attorneys and the judge questioned potential jurors about the publicity surrounding the trial and whether they could be fair and neutral arbiters. Each empaneled juror affirmed the ability to be a neutral finder of fact. Defendant specifically identifies seven jurors who, he argues, should have been excused for cause because of media exposure. Jurors 4, 20, 22, and 38 were empaneled on the jury, and Defendant used peremptory challenges to excuse Jurors 33, 45, and 65.

{13}     Jurors 20, 22, and 38 acknowledged that they had seen news coverage about the case but testified that it would not affect their ability to be impartial. Jurors 4 and

7

33 expressed a degree of sadness or sympathy for the victim but attested that they could still be fair and impartial finders of fact. Juror 45 indicated in a pre-voir-dire questionnaire that Defendant might be guilty, and Juror 65 wanted to "see justice," but both freely affirmed that Defendant was innocent until proven guilty and that they could be fair and impartial.

{14} A careful examination of the record reveals that the trial court took great care to empanel a jury that could fairly decide the case. Our case law is clear. "Exposure of venire members to publicity about a case by itself does not establish prejudice or create a presumption of prejudice." *Barrera*, 2001-NMSC-014, ¶ 18 (internal quotation marks and citation omitted). "[T]he pertinent inquiry is whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.* (omission in original) (internal quotation marks and citation omitted). We find no evidence of such fixed opinions. As noted previously, every juror Defendant asserts should have been removed for cause affirmatively stated that he or she could be impartial and would strive to decide the case fairly. The trial court seated a jury and in so doing determined that actual prejudice did not exist among the jurors selected.

{15} Defendant asks us to look past the affirmative statements of the jurors during

8

voir dire and argues that these jurors should have been dismissed for cause merely because some had heard details of the case and that "a juror's affirmance of impartiality is not conclusive" (internal quotation marks and citation omitted). On matters of credibility we will not replace the trial court's judgment with our own. *See State v. Hernandez*, 1993-NMSC-007, ¶ 52, 115 N.M. 6, 846 P.2d 312. The trial court is in a better position than this Court "to assess the demeanor and credibility of prospective jurors." *Id.*; *see State v. Johnson*, 2010-NMSC-016, ¶ 34, 148 N.M. 50, 229 P.3d 523 ("The trial court . . . is in the best position to determine whether voir dire has sufficiently exposed any biases that may preclude jurors from acting fairly and impartially." (internal quotation marks and citation omitted)). The record provides no evidence that the trial court manipulated the jurors, or in any way persuaded them to declare impartiality. Furthermore, the transcript of voir dire makes clear that the trial court gave the attorneys ample time and granted them great latitude to question prospective jurors regarding their potential biases. Each juror that Defendant argues should have been excused freely affirmed the ability to be impartial.

{16} This Court cannot engage in judgment of the jurors' character from the cold record before it. The trial court determined through voir dire that the jurors, although

they may have heard of the case, were capable of impartiality. "More is not required." *Barrera*, 2001-NMSC-014, ¶ 18. We decline to adopt Defendant's argument that *any* exposure by the jurors to news about the case necessarily requires that those jurors be dismissed. If we were to adopt Defendant's argument, our trial courts would be hard pressed to hold a trial given today's media saturated society. The trial court did not abuse its discretion by declining to excuse those jurors for cause.

{17} This Court need not decide the merit of the trial court's initial decision to move the venue to Valencia County. As we have discussed, an unbiased jury was actually selected and seated, rendering this issue moot. Actual prejudice, not presumed prejudice, is the standard by which we review the trial court's decision in this case. *Id.* ¶ 16. The parties and the trial court made sufficient inquiry during voir dire into the actual prejudice of the jurors. The jurors selected did not exhibit actual prejudice. The trial court acted within its discretion to deny the renewed motion to change venue. Defendant's argument therefore fails.

**B.     Prejudicial Effect of Security Presence in the Courtroom**

{18} Defendant argues that the level of courthouse security during voir dire rose to such an extreme that the jurors could not help but be prejudiced against Defendant. Because of this, Defendant moved for a mistrial during the second day of voir dire.

10

### 1.    Standard of Review

{19}    A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion. *State v. Ernest Joe Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993. "We review the security arrangements only to determine if the security arrangements were an abuse of discretion by the trial court." *State v. Martinez*, 1982-NMCA-020, ¶ 10, 97 N.M. 540, 641 P.2d 1087.

### 2.    The Trial Court Did Not Abuse Its Discretion by Denying Defendant's Motion for a Mistrial Due to the Security Presence During Voir Dire

{20}    The mere presence of security personnel at a trial "need not be interpreted as a sign that the defendant is particularly dangerous or culpable." *Holbrook v. Flynn*, 475 U.S. 560, 560 (1986). "Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence." *Id.* at 569. In fact, "it is entirely possible that jurors will not infer anything at all from the presence of the guards." *Id.* Depending on where the guards sit, how they are armed, and the number of officers present, the jury may perceive the security "more as elements of an impressive drama than as reminders of the defendant's special status." *Id.* The presence of armed guards in our society has, in many cases, desensitized the public in that "they are doubtless taken for granted so long as their numbers or weaponry do

11

not suggest particular official concern or alarm." *Id.*

{21} The record contains little evidence of what the security team actually looked like during voir dire and later during trial. Although not evidence, defense counsel's statements are illustrative. *State v. Jacobs*, 1985-NMCA-054, ¶ 24, 102 N.M. 801, 701 P.2d 400 (stating that defense counsel's claim that the jury observed the defendant wearing handcuffs "is not evidence" of "the facts of the [claim]"). Here, defense counsel stated, "I would ask the court to consider having these corrections guys not patrol the hallway with AR-15s. I know rifles. One guy was carrying six 30-round clips. I don't know who he expects to shoot with six 30- or 25-round clips, but it's overkill and it's dangerous . . . ." The trial judge said twice that he would ask the sheriff to "tone down" the security presence, specifically "with regard to . . . long rifles." But Defendant provided this Court with no photographs of the security at the courthouse and no witness testimony regarding security and never asked the judge to take judicial notice of any fact. Defense counsel made certain claims about the security, but without evidence this Court simply cannot take those claims as undisputed fact. *Id.* ¶ 24 ("As to the facts of the incident, there is nothing. All we have is counsel's claim, which is not evidence."). Defendant does not raise any claims of overbearing security other than during voir dire. The record does not indicate

whether the trial court cured the issue.

{22} Defendant had the opportunity to ask about every prospective juror's thoughts, impressions, and feelings regarding the courthouse security. Defendant did not elicit a single response that indicated the security was so pervasive as to prohibit impartiality. Jurors admitted that they noticed the security presence but most jurors indicated they felt safe; some thought the security was to protect Defendant; others thought it was a precaution in the event of protestors; and still others thought the security was standard. All jurors affirmed that the security did not affect their ability to be fair and impartial.

{23} This Court has nothing to consider except the jurors' testimony about their thoughts regarding the security, which consistently indicates the security was not prejudicial. Defendant does not bring to our attention any other concerns regarding security beyond what was urged during voir dire. This Court cannot speculate as to how intrusive or prejudicial the security might have been. It is trial counsel's duty to preserve error and present sufficient evidence of the preserved error for appellate review. Defendant did not meet his burden to prove prejudice, actual or otherwise. We conclude that the trial court did not abuse its discretion by denying Defendant's motion for mistrial.

**C.     The Trial Court's Decision to Permit Evidence of Uncharged Robberies**

{24}     In the months leading up to Officer Benner's murder, Defendant and his accomplice, Ms. Littles, committed at least seven armed robberies to support their drug habit. During trial, Ms. Littles described how she and Defendant typically robbed businesses and how she and Defendant had robbed a Taco Bell only a few hours prior to Officer Benner's murder. Ms. Littles identified the Taco Bell that she and Defendant robbed, she identified Defendant robbing the Taco Bell on surveillance video, she identified the Durango that she drove as the getaway vehicle, and she identified the type and caliber of pistol Defendant used in the robbery. Additional testimony detailed how, following Officer Benner's murder, Defendant robbed a Shell/Giant station in Albuquerque on May 26, 2015, at approximately 2 a.m. The detective investigating both the Taco Bell robbery and the Shell/Giant robbery identified Defendant as the perpetrator of both robberies.

{25}     The trial court ruled that evidence of the Taco Bell and Shell/Giant robberies was admissible to show "Defendant's identity, intent, motive, and plan" and that its "probative value . . . outweighed any undue prejudice." The trial court ultimately allowed the State to briefly inquire about the earlier robberies that Defendant had perpetrated with Ms. Littles between March 22, 2015, and May 24, 2015 (earlier

14

robberies), to provide context for her plea agreement or as a preemptive disclosure should Defendant elect to use them to discredit Ms. Littles' testimony.

**1.    Standard of Review**

{26}    Admission of evidence of other crimes under Rule 11-404(B) NMRA is within the sound discretion of the trial court, and its determination will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Otto*, 2007-NMSC-012, ¶ 9, 141 N.M. 443, 157 P.3d 8. Likewise, the exclusion of relevant evidence under Rule 11-403 NMRA "explicitly recogniz[es] the large discretionary role of the [trial court] in controlling the introduction of evidence." *State v. Day*, 1978-NMCA-018, ¶ 26, 91 N.M. 570, 577 P.2d 878 (internal quotations marks and citation omitted). In testing the balance between the relevant probative value and prejudicial effect of evidence under Rule 11-403, an abuse of discretion results "when the trial court's decision is contrary to logic and reason." *Davila v. Bodelson*, 1985-NMCA-072, ¶ 12, 103 N.M. 243, 704 P.2d 1119.

**2.    The Trial Court Did Not Abuse Its Discretion by Allowing Testimony About the Earlier Robberies**

{27}    "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 11-404(B)(1). Defendant properly preserved his objection

to Ms. Littles' testimony about the earlier robberies. Nonetheless, the trial court was within its discretion to admit the testimony. Evidence of a defendant's crimes, wrongs or other acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11–404(B)(2). Under Rule 11-404(B)(2) the list of permissible uses of prior bad act evidence is not exhaustive. *Otto*, 2007-NMSC-012, ¶ 10. Proffers of other wrongs excluding those to prove character may be admissible, but the trial court must always "determine that the probative value of the evidence outweighs the risk of unfair prejudice, pursuant to Rule 11-403." *Id.*

{28}     The trial court allowed testimony about the earlier robberies to give context to Ms. Littles' plea deal and to rebut impeachment by Defendant. The trial court refused to allow the State to delve into the details of every single robbery Ms. Littles admitted committing with Defendant. Instead, the trial court limited the State's inquiry to the general method the pair used to rob businesses, that the earlier robberies occurred, and that Ms. Littles was with Defendant at each occurrence. Additionally, the State's inquiry gave context to Ms. Littles' relationship with Defendant and Ms. Littles' role during earlier robberies, which were relevant to her role and physical position during the murder of Officer Benner. It is not the job of this Court to speculate on every

16

conceivable purpose a portion of testimony may have, and "[i]f there are reasons both for and against a court's decision, there is no abuse of discretion." *State v. Smith*, 2016-NMSC-007, ¶ 27, 367 P.3d 420. The trial court was within its discretion to allow Ms. Littles to testify about the earlier robberies.

**3. The Trial Court Did Not Abuse Its Discretion by Allowing Evidence of the Robberies on May 25 and May 26**

{29} Under Rule 11-404(B)(2), evidence of the robberies committed on May 25, 2015, and May 26, 2015, is "admissible for . . . proving motive . . . [or] identity" of the person who murdered Officer Benner. Defendant contends that the Taco Bell robbery on May 25, 2015, and the Shell/Giant robbery on May 26, 2015, are not probative of identity or motive in the murder of Officer Benner. Defendant is incorrect. The State presented evidence proving identity by showing that Defendant committed the Taco Bell and Shell/Giant robberies wearing the same clothes that Defendant was wearing at the time Officer Benner pulled him over and that Defendant used the same pistol in the Taco Bell and Shell/Giant robberies that he used to murder Officer Benner. Upon Defendant's arrest following the Shell/Giant robbery, officers found on Defendant the key to the Dodge Durango that fled the scene of Officer Benner's murder and which Defendant had used in the Taco Bell robbery, again bearing on identity. Consciousness of his guilt of the Taco Bell

17

robbery gave Defendant a motive to kill Officer Benner and thereby avoid apprehension and a return to prison. Ms. Littles testified that "Andrew always said he was never going to go back to prison. It was either going to be him or the cops."

{30} The probative value of evidence about the Taco Bell and Shell/Giant robberies outweighs any unfair prejudice to Defendant. The evidence was admissible as probative of both identity and motive in the murder of Officer Benner. The trial court did not abuse its discretion by admitting evidence of the Taco Bell and Shell/Giant robberies.

**4. The Trial Court Did Not Abuse Its Discretion by Declining to Sever the Charge of Conspiracy to Commit Armed Robbery**

{31} Defendant argues that if the evidence of the May 25 and May 26 armed robberies was probative of conspiracy to commit armed robbery, then the trial court's denial of the motion to sever the highly prejudicial conspiracy charge was an abuse of discretion. "The decision to grant a severance motion lies within the trial judge's discretion and will not be overturned on appeal unless the joinder of offenses results in *actual* prejudice against the moving party." *State v. Garcia*, 2011-NMSC-003, ¶ 16, 149 N.M. 185, 246 P.3d 1057 (emphasis in original). "Even when the trial court abuses its discretion in failing to sever charges, appellate courts will not reverse unless the error actually prejudiced the defendant." *State v. Leonardo Gallegos*, 2007-

18

NMSC-007, ¶ 18, 141 N.M. 185, 152 P.3d 828. "If the evidence would have been cross-admissible, then any inference of prejudice is dispelled and our inquiry is over." *Id.* ¶ 20.

{32} In addition to providing evidence of identity and establishing motive for the murder, the Taco Bell and Shell/Giant robberies are admissible as "background evidence to show the context of other admissible evidence," *State v. Allen*, 2000-NMSC-002, ¶ 43, 128 N.M. 482, 994 P.2d 728, in this case, conspiracy to commit armed robbery. The evidence of the Taco Bell and Shell/Giant robberies was admissible as probative of both murder and conspiracy to commit armed robbery. The evidence was cross-admissible, Defendant was not prejudiced, and the trial court did not abuse its discretion by refusing to order severance of conspiracy to commit armed robbery.

**D.    Admission of Nonverbal Portion of Interrogation Video**

{33} Agent Steve Montano of the New Mexico State Police interrogated Defendant following his arrest on May 26, 2015. During a portion of Defendant's interrogation Agent Montano left the room. While Agent Montano was absent, video surveillance recorded a shift in Defendant's demeanor. Defendant made hand gestures in the shape of a gun. From Defendant's position in the holding cell during interrogation,

19

Defendant could see across the hall into another holding cell occupied by his cousin Crystal Romero, who had been arrested with Defendant after the Shell/Giant robbery. His hand gestures were made in Crystal's direction. At trial Defendant moved to suppress the video. The trial court admitted the muted video showing Defendant's demeanor.

**1.      Standard of Review**

{34}      In reviewing an order denying the suppression of evidence, "we defer to the district court's findings of fact that are supported by substantial evidence, and we review the district court's application of the law to the facts de novo." *State v. Randy J.*, 2011-NMCA-105, ¶ 10, 150 N.M. 683, 265 P.3d 734. Here, the relevant facts are undisputed. We determine whether, as a matter of law, the district court erred in admitting the video showing Defendant's nonverbal conduct. We conclude that it did not.

**2.      The Trial Court Did Not Err When It Admitted Evidence of Nonverbal Conduct by Defendant**

{35}      "Under the Fifth Amendment, the privilege against self-incrimination only protects the accused from being compelled to provide the state with evidence of a testimonial or communicative nature." *Randy J.*, 2011-NMCA-105, ¶ 16 (internal quotation marks and citation omitted); *see also State v. Harris*, 2017 WI 31, ¶ 46, 892

20

N.W.2d 663 (stating that the Fifth Amendment to the United States Constitution protects an individual from interrogation compelled by law enforcement but not from the individual's own incriminating actions).

{36} The two-fold issue before this Court is whether Defendant was (1) compelled (2) to communicate. We conclude that Defendant's non-verbal conduct was not compelled. Therefore, we need not reach the issue of whether his conduct amounted to a communication.

{37} The muted video depicting Defendant's gestures and demeanor showed Defendant after he had already been *Mirandized* and had invoked the right to remain silent. If the demeanor evidence communicated a response to a question or if Agent Montano had otherwise compelled Defendant to answer, then any response Defendant gave would likely be protected. But this was not the case after Agent Montano left the room and Defendant was alone. Defendant did not gesture in response to a question asked by Agent Montano or any law enforcement officer. Defendant "was not subjected to compelling influences [or] psychological ploys . . ." and his voluntary conduct cannot be said to have been compelled. *See Arizona v. Mauro*, 481 U.S. 520, 529 (1987). Defendant's demeanor and hand gestures were not protected under the Fifth Amendment to the United States Constitution.

{38} The trial court based its decision to show the muted video of Defendant to the jury on a correct application of the law, and that decision is supported by sufficient evidence.

**E.      The Trial Court's Admission of Defendant's Jail Telephone Call**

{39} The trial court admitted the recording of a jail telephone call that the State presented as evidence implicating Defendant in Officer Benner's murder. Defendant objected, arguing that the identity of the inmate making the call could not be sufficiently authenticated to warrant admission under Rule 11-801(D)(2)(a) NMRA (allowing admission of an opposing party's own statement as an exclusion from hearsay).

**1.      Standard of Review**

{40} We review a trial court's admission or exclusion of evidence for an abuse of discretion. *State v. Bailey*, 2017-NMSC-001, ¶ 12, 386 P.3d 1007. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *Id.* (quoting *State v. Apodaca*, 1994-NMSC-121, ¶ 23, 118 N.M. 762, 887 P.2d 756 (internal quotation marks omitted)).

**2.      The Trial Court Did Not Abuse Its Discretion by Allowing the Jail Telephone Call Recording to Be Played for the Jury**

{41} "To satisfy the requirement of authenticating or identifying an item of

22

evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 11-901(A) NMRA. A witness's identification of a voice requires only a "*minimal* showing" that the voice belongs to the person the witness purports that it to belongs to and sets a "low threshold for admissibility." *State v. Loza*, 2016-NMCA-088, ¶ 22, 382 P.3d 963 (internal quotation marks and citation omitted); *State v. Padilla*, 1982-NMCA-100, ¶ 5, 98 N.M. 349, 648 P.2d 807. "The identity of a party making a telephone call may be established by either direct or circumstantial evidence." *State v. Roybal*, 1988-NMCA-040, ¶ 13, 107 N.M. 309, 756 P.2d 1204, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110. The jury is left to decide the weight given to the evidence. *Loza*, 2016-NMCA-088, ¶ 22.

{42} Defendant argues that the State provided no date for the phone call, that there were thirteen other inmates named "Andrew" at the Albuquerque Metropolitan Detention Center (MDC) when the call was placed, and that inmates often switch their personal identification numbers (PIN) to either avoid having their phone calls recorded or simply because they are out of money on their phone cards. Considering the totality of the circumstances, these arguments are without merit. Sufficient evidence justifies the trial court's decision to admit the recording into evidence. The

23

inmate in the recording self-identifies as "Andrew," uses Andrew Romero's PIN, and asks about a person named "Crystal," which is the name of Defendant's cousin who was arrested with him. The inmate references his move from detention in Sandoval County to MDC. This move is consistent with the State's claim that Defendant was moved to MDC so that he could appear at a probation violation hearing in Albuquerque. The State points out that Defendant's move to MDC placed him there two weeks after the murder of Officer Benner, coinciding with the inmate's inquiry about the media coverage of his case and his statement, "Still? Why, it's already been two weeks. A la verga." At the time the call was made, media attention surrounding the case was high, which coincides with the inmate's statement about the high profile nature of the case. Additionally, the inmate's question, "What about what's her name; did I really shoot her or no?" and the response, "Yeah, you shot her in the foot," is consistent with the injury Ms. Littles sustained when a bullet fired by Defendant at the scene of Officer Benner's murder ricocheted and struck her in the foot.

{43}    Detective Richard Romero of the Rio Rancho Police Department identified the inmate on the call as Defendant after having listened to three other phone calls, all of which were placed with Andrew Romero's PIN. In *United States v. Thomas*, the identifying witness conversed with the accused three times. 586 F.2d 123, 133 (9th

24

Cir. 1978). In *United States v. Smith*, the identifying witness heard the defendant's voice only twice. 635 F.2d 716, 719 (8th Cir. 1980). In both cases, the witnesses' identifications were sufficient to admit the voice evidence. *See Padilla*, 1982-NMCA-100, ¶ 5. Here, not only does Detective Romero identify Defendant's voice as the same voice he identified in three other calls, but substantial corroborating evidence indicates that Defendant placed the telephone call that was recorded and played for the jury.

{44}     The circumstances described here are sufficient to make the "minimal showing" of familiarity with Defendant's voice to justify Detective Romero's identification. The trial court's decision to admit the recording was not against logic and was not an abuse of discretion.

**F.     Cumulative Error**

{45}     Defendant contends that cumulative error by the trial court requires a new trial. Defendant argues that the cumulative effect of the errors previously discussed, statements made by the prosecutor during closing argument and error in allowing two in-court identifications by witnesses, deprived Defendant of a fair trial. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively

25

deprive the defendant of a fair trial." *State v. Carrillo*, 2017-NMSC-023, ¶ 53, 399 P.3d 367 (internal quotation marks and citation omitted); *see also State v. Alfred Baca*, 1995-NMSC-045, ¶ 39, 120 N.M. 383, 902 P.2d 65 (reversing multiple convictions based on cumulative error). In this case, because we conclude that no trial error occurred, cumulative error did not deprive Defendant of a fair trial.

**1.      The Contents of Prosecutor's Slide During Closing Were Not Prejudicial**

{46}      Defendant asserts that the trial court erred by not issuing a limiting instruction to the jury after the word "stitches" appeared on the prosecutor's Power Point slide used during closing argument. Defendant contends that by showing the jury the word "stitches" the State was attempting to imply that Defendant's aunt, who was in prison at the same time as Ms. Littles, engaged in witness intimidation.

{47}      The State and Defendant are "allowed wide latitude in closing argument and the trial court has wide discretion in . . . controlling closing argument." *State v. Venegas*, 1981-NMSC-047, ¶ 12, 96 N.M. 61, 628 P.2d 306. The trial court determined that the Power Point slide did not warrant a limiting instruction. From our perspective, the word "stitches" does not carry the inherent prejudicial connotation that Defendant urges. Importantly, the Power Point slide Defendant objected to is not part of the record before this Court; therefore, we have no way of putting the word

26

"stitches" into context. Without a record of the objection, this Court will not consider this issue.

**2.    Two In-Court Identifications of Defendant Made by Witnesses Were Not Error**

{48}    During trial and for the first time, two eyewitnesses, one from the scene of Officer Benner's murder and one from a gas station visited by Defendant and Ms. Littles, identified Defendant as the man they saw around the time of Officer Benner's murder. Defendant argues that the in-court identifications were "tainted by pretrial publicity." This Court recently addressed this very issue in *State v. Ramirez,* 2018-NMSC-003, ¶ 33, 409 P.3d 902, in which we held that "[i]t is only when law enforcement are the source of the taint that due process concerns arise."

{49}    Defendant had ample procedural safeguards at his disposal to address the fallibility of eyewitness testimony, among which was "the right to the effective assistance of an attorney who can expose the flaws of eyewitness testimony on cross-examination and focus the jury's attention on such flaws during opening and closing arguments." *Id.* ¶ 35 (citing *Perry v. New Hampshire*, 565 U.S. 228, 245-47 (2012)). Defense counsel did just that. They brought the witnesses' inconsistencies to the jury's attention on cross-examination and in closing argument. It is the responsibility of the jury to weigh a witness's credibility and determine the accuracy of an in-court

27

identification. *State v. Cheadle*, 1983-NMSC-093, ¶ 15, 101 N.M. 282, 681 P.2d 708, *overruled on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36, 210 P.3d 783. The trial court did not err by allowing the in-court identifications.

**G.    Defendant's Conviction for Shooting at or from a Motor Vehicle Constitutes Double Jeopardy**

{50}    Defendant's conviction for shooting at or from a motor vehicle violates the Double Jeopardy Clause of the New Mexico Constitution and must be vacated. N.M. Const. art. II, § 15 ("No person shall . . . be twice put in jeopardy for the same offense."). The Double Jeopardy Clause protects Defendant from being punished both for the murder of Officer Benner and for causing great bodily harm to Officer Benner by shooting from a motor vehicle, where both convictions were predicated on Defendant's unitary act of shooting Officer Benner. *State v. Montoya*, 2013-NMSC-020, ¶ 54, 306 P.3d 426. One of the convictions must be vacated. Because first-degree murder carries a greater sentence than shooting at or from a vehicle, *compare* NMSA 1978, § 31-18-14 (2009) (stating that a capital felony carries a sentence of "life imprisonment or life imprisonment without the possibility of . . . parole") *with* NMSA 1978, § 31-18-15(A)(4) (2007, amended 2016) (stating that a second-degree felony resulting in death carries a fifteen-year sentence), this Court must vacate Defendant's conviction for shooting at or from a motor vehicle. *State v. Torres*, 2018-NMSC-013,

28

¶ 28, 413 P.3d 467.

**H.    Sufficiency of the State's Evidence to Convict Defendant on the Charges of Aggravated Fleeing and Murder in the First Degree**

**1.    Standard of Review**

{51}    In challenging the sufficiency of evidence used to convict a defendant of a crime, "we must determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Reed*, 2005-NMSC-031, ¶ 14, 138 N.M. 365, 120 P.3d 447 (internal quotation marks and citation omitted). We review "the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of the verdict." *Id.* We will "determine whether *any* rational jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt." *Id.*

**2.    The State Presented Sufficient Evidence for a Rational Jury to Convict Defendant of Aggravated Fleeing**

{52}    Defendant was charged with and convicted of aggravated fleeing a law enforcement officer (aggravated fleeing) contrary to Section 30-22-1.1(A). Defendant argues that insufficient evidence existed to prove all of the elements of aggravated fleeing. The relevant provision of the statute reads,

> Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle *in pursuit* in accordance with the provisions of the Law Enforcement Safe Pursuit Act.

Section 30-22-1.1(A) (emphasis added). Defendant contends that the State did not carry its burden with regard to "in pursuit" because Defendant was not pursued when he fled the scene of Officer Benner's murder. Defendant does not dispute that, upon fleeing from Officer Benner's murder, Defendant drove the Durango in a manner that endangered the lives of others or that Officer Benner was a uniformed law enforcement officer in an appropriately marked law enforcement vehicle.

{53}     The State is correct when it points out that although Section 30-22-1.1(A) includes "in pursuit" in its language, "pursuit" is not an element of the Uniform Jury Instruction or of the instruction the jury actually received. Tracking UJI 14-2217 NMRA, the instruction to the jury stated,

> For you to find the defendant guilty of aggravated fleeing a law enforcement officer . . . , the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
> 1.     The defendant operated a motor vehicle,
> 2.     The defendant drove willfully and carelessly in a manner that endangered the life of another person,
> 3.     The defendant had been given a visual or audible signal to stop by Officer Gregg Benner in an appropriately marked law

30

enforcement vehicle,

4. The defendant knew that Officer Gregg Benner had given him an audible or visual signal to stop,

5. This happened in New Mexico, on or about the 25th day of May, 2015.

The absence of "pursuit" in the jury instruction is not dispositive of whether pursuit is an element essential to aggravated fleeing. In this case we conclude that sufficient evidence existed to properly convict Defendant under Section 30-22-1.1(A).

{54} During the initial traffic stop, Officer Benner attempted to approach the passenger side of the Durango when it suddenly accelerated out of the Arby's parking lot. Inside the Durango, Defendant with his Beretta pistol in hand told Ms. Littles, "Drive bitch," and Defendant put the vehicle in gear. As Ms. Littles and Defendant fled from Officer Benner, the Durango nearly collided with a bush, at which point Defendant grabbed the steering wheel and straightened out the vehicle. Defendant then jumped from the passenger seat to the driver seat and shoved Ms. Littles out of the moving vehicle. Shortly thereafter, Defendant brought the Durango to a stop and waited for a pursuing Officer Benner to catch up. Defendant waited until Officer Benner approached the Durango then fired his Beretta four times. Defendant then fled driving the Durango.

{55} Defendant's flight from Officer Benner was part of a continuing course of

aggravated fleeing. It began when Officer Benner lawfully stopped the Durango and continued when Defendant put the Durango in gear with gun in hand and ordered Ms. Littles to drive. Defendant's flight and Officer Benner's pursuit ended when Defendant subsequently stopped a second time and killed Officer Benner. The facts of this case demonstrate that Defendant's flight resulted in Officer Benner's pursuit, which ended with the second traffic stop.

{56} The jury found sufficient evidence to convict Defendant of aggravated fleeing.

**3. The State Presented Sufficient Evidence for a Rational Jury to Convict Defendant of Murder in the First Degree**

{57} The Defendant argues that there is insufficient evidence of "deliberate intent" to support his conviction for first-degree murder. The jury found that Defendant's conduct rose above a "mere unconsidered and rash impulse" and that Defendant possessed "the deliberate intention to take away the life of Gregg Benner." *See* UJI 14-201 NMRA (providing essential elements of willful and deliberate murder).

{58} This Court has held that rational juries could draw "inferences of deliberation from . . . evidence of the defendant's attitude toward the victim, and the defendant's own statements." *State v. Flores*, 2010-NMSC-002, ¶ 21, 147 N.M. 542, 226 P.3d 641 (citing *State v. Duran*, 2006-NMSC-035, ¶ 11, 140 N.M. 94, 140 P.3d 515). Ms. Littles testified that Defendant shoved her out of the vehicle after the two initially

32

fled in the Durango because "he didn't want [her] to be involved in anything that was going to happen." Ms. Littles also testified that Defendant had told her on "quite a few" occasions that "he was never going back to prison. It was either going to be him or the cops." Finally, Ms. Littles testified that during the initial traffic stop Defendant repositioned his pistol from under his seat to alongside the center console of the Durango, held in his hand. Ms. Littles provided substantial evidence about Defendant's state of mind which was probative of Defendant's deliberate intent to murder Officer Benner.

{59} In addition to Ms. Littles' testimony, witnesses and forensic experts testified about the number and timing of the shots fired by Defendant. *State v. Astorga*, 2015-NMSC-007, ¶ 65, 343 P.3d 1245 (concluding that the manner in which a killing occurs can support an inference of deliberation). The jury heard how Ms. Littles and Defendant initially sped away from Officer Benner and that Defendant shoved Ms. Littles from the vehicle, stopped the vehicle, and allowed Officer Benner to catch up and approach the vehicle where Defendant then shot him. The jury heard that Defendant fired two shots into Officer Benner, and then he paused and fired two more.

{60} Ms. Littles' statements about Defendant's state of mind immediately prior to

the murder were probative of deliberation in the context of all of the evidence introduced on that element of first-degree murder." *Id.* ¶ 65. Defendant's act of moving his pistol from a hidden position into a firing position supports an inference of Defendant's resolve to kill. *See State v. Isiah*, 1989-NMSC-063, ¶ 34, 109 N.M. 21, 781 P.2d 293 (moving a knife into the defendant's lap from a concealed position showed deliberateness rather than a random act), *overruled on other grounds by State v. Lucero*, 1993-NMSC-064, 116 N.M. 450, 863 P.2d 1071. A jury could also reason that, after shoving Ms. Littles out of the vehicle and saying he didn't want her to be involved in anything that was going to happen, then waiting for Officer Benner to approach, Defendant had determined exactly what was going to happen and that he would kill Officer Benner rather than surrender or flee. *State v. Sosa*, 2000-NMSC-036, ¶ 14, 129 N.M. 767, 14 P.3d 32 (concluding that waiting for the victim is reasonable evidence of deliberate intent).

{61} From Defendant's pause between two-round bursts, a rational jury could infer that Defendant was aiming or adjusting his fire, which could reasonably indicate thought and intent to kill. *Cf. State v. Tafoya*, 2012-NMSC-030, ¶¶ 47, 54, 285 P.3d 604 (acknowledging that multiple shots fired in very quick succession where victims were shot only once each does not indicate deliberation). Similarly, Defendant firing

four controlled shots that all struck Officer Benner, as opposed to emptying the entire magazine of the pistol, could be inferred as deliberate and controlled. *See State v. Largo*, 2012-NMSC-015, ¶ 33, 278 P.3d 532 (identifying as deliberation delaying discharge of the rifle while the victim pleaded for mercy).

{62} "[J]ust because each component may be insufficient to support the conviction when viewed alone does not mean the evidence cannot combine to form substantial, or even overwhelming, support for the conviction when viewed as a whole." *State v. Rojo*, 1999-NMSC-001, ¶ 23, 126 N.M. 438, 971 P.2d 829. When Officer Benner initially pulled over Defendant and Ms. Littles, Defendant had robbed a Taco Bell a few hours earlier and knew that there was an arrest warrant out for his violation of probation. Defendant had several options, including whether to (1) cooperate with Officer Benner during the stop and likely be arrested, (2) attempt to flee from Officer Benner, or (3) exercise the option that he chose—wait until Officer Benner's approach to the Durango was so close that Defendant could not miss and then shoot Officer Benner in the chest four times at point-blank range. *See Astorga*, 2015-NMSC-007, ¶¶ 4-5, 63. The jury could reasonably determine that "Defendant contemplated all of these choices and, even if he did not make his final decision until the last second, the decision to kill [Officer Benner] was nonetheless a deliberate

one." *See id.* ¶ 63 (describing circumstances of a deputy's murder during a traffic stop and concluding that "the manner of the killing alone supported an inference of deliberation"); *Sosa*, 2000-NMSC-036, ¶ 14 (concluding that a murder where the victim was attempting to escape from the attacker is a circumstance sufficient to support deliberate intent).

{63}     The State presented sufficient evidence for a rational jury to conclude that Defendant manifested a deliberate intention to kill Officer Benner from the time the traffic stop was initiated until Defendant fired the fourth shot from his pistol into Officer Benner's chest.

## III.    CONCLUSION

{64}     For these reasons we affirm Defendant's convictions for first-degree murder, tampering with evidence, conspiracy to commit armed robbery, aggravated fleeing a law enforcement officer, and concealing identity. We vacate Defendant's conviction for shooting at or from a motor vehicle on double jeopardy grounds.

{65}     **IT IS SO ORDERED.**

_____
                **GARY L. CLINGMAN, Justice**

**WE CONCUR:**


_____
**JUDITH K. NAKAMURA, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**CHARLES W. DANIELS, Justice**


_____
**BARBARA J. VIGIL, Justice**