This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: June 24, 2021**

**No. S-1-SC-37760**

**STATE OF NEW MEXICO,**

>Plaintiff-Appellee,

v.

**ALEJANDRO AZAMAR-NOLASCO,**

>Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF COLFAX COUNTY**
**Emilio J. Chavez, District Judge**

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Eran Shemuel Sharon, Assistant Attorney General
Santa Fe, NM

for Appellee

### DECISION

**VIGIL, Justice.**

**{1}** A jury convicted Defendant Alejandro Azamar-Nolasco of first-degree, willful and deliberate murder, aggravated burglary, and aggravated stalking. Sentenced to life plus ten and one-half years, Defendant exercised his right of direct appeal to this Court. *See* N.M. Const. art VI, § 2; Rule 12-102(A)(1) NMRA. Defendant raises four issues on appeal, three of which he argues created a "fundamentally unfair trial" process and justify reversal of his convictions: (1) the prosecutor commented on Defendant's invocation of his right to counsel, (2) the district court denied his motion to sever the

aggravated stalking charge from the other charges for purposes of trial, and (3) the district court admitted surveillance video that was not properly authenticated. Fourth and finally, Defendant argues that his convictions violate the prohibition against multiple punishments for the same offense under the Double Jeopardy Clause of the United States Constitution. *See* U.S. Const. amend. V. Based on the following reasoning, we conclude that Defendant's convictions and sentences for aggravated burglary and first-degree, willful and deliberate murder result in a violation of double jeopardy. We therefore vacate Defendant's aggravated burglary conviction and sentence. We affirm Defendant's convictions of first-degree murder and aggravated stalking. Because the legal issues in this case "have been previously decided by the Supreme Court or the Court of Appeals[,]" we exercise our discretion under Rule 12-405(B) NMRA to issue this non-precedential decision.

## I.    BACKGROUND

**{2}**    The story of Mandy Vanlandingham's death is one of escalating domestic violence. The trial evidence tells the following tragic story. Mandy Vanlandingham (Victim) and Defendant dated for approximately two years. After Victim ended the relationship, Defendant would not leave Victim alone, repeatedly calling and texting her. Defendant developed a pattern of driving by Victim's house and following her. In response to this behavior, and after Defendant slashed a tire on Victim's mother's vehicle, Victim obtained a restraining order against Defendant. Defendant was alleged to have violated the restraining order on multiple occasions. The culmination of this stalking and harassment was Defendant's brutal murder of Victim.

**{3}**    Victim's mother was the one who found Victim dead in her bathroom. Captain James Valdez of the Raton Police Department was called to the scene. When he arrived, he observed Victim "lying on her back in the bathtub." He noticed that the bathroom was humid, and the bath mat was fully saturated with water. According to Captain Valdez, Victim's mouth was open and full of standing water, and she appeared to have bruising and abrasions around her chin, neck, shoulders, and lower abdomen. Captain Valdez also noticed that Victim's head was positioned directly underneath the bathtub faucet. Captain Valdez observed two blood smears and some blood spatter on the bathtub, as well as a large clump of Victim's hair on the edge of the bathtub. Following an autopsy, the medical examiner determined that Victim's cause of death was strangulation and drowning, and the manner of death was homicide.

**{4}**    After a three-day trial, the jury convicted Defendant on all counts: aggravated stalking, contrary to NMSA 1978, § 30-3A-3.1(A)(1) (1997), aggravated burglary, contrary to NMSA 1978, § 30-16-4(C) (1963), and first-degree, willful and deliberate murder, contrary to NMSA 1978, § 30-2-1(A)(1) (1994). Defendant does not challenge the sufficiency of the evidence to support his convictions but appeals on four other grounds. Additional factual background is provided as necessary in the following analysis of Defendant's arguments on appeal.

## II.    DISCUSSION

**{5}**      We address Defendant's four issues in turn: (1) the prosecutor's comments in closing argument, (2) the denial of Defendant's motion to sever, (3) the admission of the surveillance video, and (4) the violation of Defendant's double jeopardy rights. Following our analysis of each, we conclude that Defendant received a fair trial, but we vacate his conviction and sentence for aggravated burglary on double jeopardy grounds.

### A.    The Prosecutor's Comments in Closing Argument were not Fundamental Error

**{6}**      During trial, the State introduced and played a video recording of Defendant's interview with police. The video included footage of Defendant invoking his right to counsel. Later, in closing argument, the defense attempted to bolster Defendant's credibility by emphasizing that Defendant willingly spoke to police during the investigation even though he was not required to do so. Defense counsel argued, "Mr. Azamar-Nolasco was under no obligation to speak to police. He was under no obligation to testify here today." In rebuttal, the State addressed this point, stating,

> [Defense counsel] said [Defendant] didn't have to go talk to police. That's right he didn't and when did he stop? As soon as the police said we put you at the house of [Victim]. Guess who stopped talking then, right? And everything that he said ever since doesn't line up with what everyone else has said—everyone he called to the stand to corroborate his story— doesn't match up. So I won't talk when I'm cornered, but when I'm not, and I get to talk, and I allow my attorney to correct my story, I'll say something. Okay. Good. Go ahead. And he did.

Defense counsel then asked, "Your Honor, may we approach?" The record is not clear whether defense counsel objected to the prosecutor's comment during the ensuing bench conference or whether the district court made a formal ruling. After the bench conference, the prosecutor wrapped up the rebuttal.

**{7}**      Defendant now contends that the State improperly commented on his right to counsel and his right to remain silent by introducing the video recording and then using his invocation of the right to counsel to insinuate that he was guilty. Defendant asserts that, by doing so, the State violated his right to a fair trial and due process, which would amount to fundamental error.

### 1.    Preservation and standard of review

**{8}**      Generally, "eliciting testimony or commenting on a defendant's exercise of his or her right to counsel is . . . reversible error." *State v. McDowell*, 2018-NMSC-008, ¶ 5, 411 P.3d 337. However, when a defendant fails to object to the testimony or comment, as Defendant concedes was the case here, we only reverse if the error was fundamental. *Id.* ¶ 7. The qualifications for preservation are governed by Rule 12-321(A) NMRA. That rule instructs that an error is preserved only if "a ruling or decision by the

trial court was fairly invoked." It is not clear whether a ruling of the district court was fairly invoked in this instance. We therefore conclude that Defendant did not preserve this issue, and we review for fundamental error. *See McDowell*, 2018-NMSC-008, ¶¶ 7-18.

**{9}** Under a fundamental error analysis, "[w]e first determine whether any error occurred, i.e., whether the prosecutor commented on the defendant's protected silence." *State v. DeGraff*, 2006-NMSC-011, ¶ 21, 139 N.M 211, 131 P.3d 61. If such an error occurred, we then determine whether "there is a reasonable probability that the error was a significant factor in the jury's deliberations relative to the other evidence before them." *Id.* ¶ 22. However, we do not conduct this analysis if we conclude that the defendant invited the prosecutor's mistake. *See State v. Ortega*, 2014-NMSC-017, ¶ 34, 327 P.3d 1076 ("The doctrine of fundamental error cannot be invoked to remedy the defendant's own invited mistakes." (quoting *State v. Campos*, 1996-NMSC-043, ¶ 47, 122 N.M. 148, 921 P.2d 1266)).

## 2.     Defendant invited any error of which he complains

**{10}** Assuming without deciding that the State committed error by commenting on Defendant's invocation of his right to counsel, we conclude that Defendant invited the error and thus, we decline to reverse his convictions on this ground. Before the prosecutor commented on Defendant's request for an attorney and subsequent silence during the police investigation, defense counsel attempted to buttress Defendant's credibility by highlighting his willingness to speak with police and testify at trial. Based on this willingness to talk, the defense asked the jury to infer that Defendant was not guilty. The prosecutor's comment was made in response to this line of argument. In other words, the defense invited the mistake that Defendant now alleges was fundamental error. Because Defendant invited the prosecutor's presumably improper comment, he cannot rely on the doctrine of fundamental error to seek reversal. *See Ortega*, 2014-NMSC-017, ¶ 34 ("A party may not be rewarded . . . when it invites . . . error and subsequently complains about that very error."). Accordingly, we reject Defendant's argument on this ground, and we turn to address whether the district court abused its discretion by denying Defendant's motion to sever the aggravated stalking charge.

## B.     Denial of Defendant's Motion to Sever was not an Abuse of Discretion

**{11}** Prior to trial, Defendant moved to sever the aggravated stalking count, arguing that evidence relevant to that charge was inadmissible against the murder charge. In particular, Defendant sought to exclude from the murder trial any evidence of his prior conviction of petty misdemeanor criminal damage to property arising from the incident when Defendant slashed the tire on Victim's mother's vehicle. After hearing argument from both parties, the district court denied the motion to sever, ruling that the evidence was "cross-admissible and not unfairly prejudicial." Defendant now asserts that the district court abused its discretion when it denied the motion to sever.

### 1. Standard of review

**{12}** We review the denial of a motion to sever for an abuse of discretion. *See State v. Garcia*, 2011-NMSC-003, ¶ 16, 149 N.M. 185, 246 P.3d 1057 ("The decision to grant [or deny] a severance motion lies within the trial judge's discretion and will not be overturned on appeal unless the joinder of offenses results in *actual* prejudice against the moving party."). *See* Rule 5-203(C) NMRA ("If it appears that a defendant or the state is prejudiced by a joinder of offenses . . . , the court may order separate trials of offenses . . . or provide whatever other relief justice requires."). The "[d]efendant bears the burden of establishing that he was actually prejudiced by a failure to sever." *Garcia*, 2011-NMSC-003, ¶ 16. We will not infer prejudice if the evidence supporting one charge is also admissible to support the remaining charges. *See State v. Gallegos*, 2007-NMSC-007, ¶ 20, 141 N.M. 185, 152 P.3d 828.

### 2. Defendant failed to establish actual prejudice

**{13}** To determine whether there was "actual prejudice to an accused in the failure-to-sever context[,]" we consider various factors on both sides of the question. *State v. Lovett*, 2012-NMSC-036, ¶ 56, 286 P.3d 265. Those factors that demonstrate the presence of actual prejudice include:

> (1) the prosecution intertwining the offenses in opening statement, during its case-in-chief, or in closing argument; (2) the defendant being found guilty on all counts; (3) factual similarities linking the offenses; (4) offenses that are inflammatory in nature; (5) unusually long and complex trials; and (6) a conviction on a charge where the evidence is thin.

*Id.* Conversely, the factors that indicate a lack of prejudice include:

> (1) dissimilar offenses such that a jury would not confuse them; (2) the defendant being acquitted of some charges; and (3) proper jury instructions that adequately make clear to the jury that it must not consider evidence inadmissible to a particular count when coming to a verdict on that count.

*Id.* "The factors may have varying degrees of relevancy in different cases." *Id.*

**{14}** Defendant claims that all the factors demonstrating actual prejudice are met in this case. We consider each factor as presented by Defendant. First, without citation to the record, Defendant asserts that the State intertwined the offenses "throughout the trial and in closing argument." We disagree that the offenses were impermissibly intertwined. Any intertwining in this case results from the fact that Defendant was accused of committing all three crimes against a single victim. For this reason, the cases that Defendant cites in his brief to support his argument on this factor are inapposite.

**{15}** A defendant is more likely to be actually prejudiced by the joinder of offenses if the prosecution intertwines a defendant's distinct criminal conduct against separate victims committed at different times in an effort to convict on all charges. In *Lovett*, a single defendant was charged and convicted of two counts of first-degree murder, arising from the killing of "two women in two separate, unrelated incidents." 2012-NMSC-036, ¶ 1. The two murder charges were joined in a single trial. *Id.* We concluded that Defendant was actually prejudiced by this joinder and vacated one of his murder convictions. *Id.* ¶¶ 84-85. The Court explained that the State "immediately intertwined the two cases," relying on "the jury's perception that the crimes were related and that [the d]efendant acted similarly in each." *Id.* ¶ 58. In addition, the Court observed that "the State went out of its way to question certain witnesses about *both murders* and to intertwine the testimony about each murder." *Id.* ¶ 74. Similarly, in *Gallegos*, the defendant was charged with several counts for sexual crimes against two victims on various occasions. 2007-NMSC-007, ¶¶ 4-6. The Court concluded that the district court erred in failing to sever the charges and trial. *Id.* ¶¶ 3, 47. In that case, the defendant was actually prejudiced by the failure to sever, in part because "the State intertwined the evidence relating to the separate offenses by presenting the testimony of [each victim] back-to-back at the very beginning of trial[,]" thereby "urg[ing] the jury to consider together the evidence pertaining to [both victims]." *Id.* ¶ 43. In the instant case, since Defendant was charged with three crimes against one victim, the State did not inappropriately intertwine the offenses in its presentation of evidence or argument to the jury.

**{16}** Turning to the second factor for determining actual prejudice—guilty verdicts on all counts—Defendant accurately states that he was convicted on every count, but he does not contest the sufficiency of the evidence supporting any count. Although we may consider whether Defendant was "found guilty on all counts," this factor does not necessarily support a determination of prejudice if sufficient evidence supports each conviction. *Cf. Lovett*, 2012-NMSC-036, ¶¶ 84-86 (concluding that the district court "committed reversible error . . . by failing to sever the two prosecutions" but affirming the defendant's convictions for the murder and criminal sexual penetration of the second victim based on the strength of the evidence against the defendant in the second case). Accordingly, we are not persuaded by Defendant's argument regarding this factor.

**{17}** Third, Defendant concludes that "the offenses were similar," but he fails to explain how he reaches that conclusion. He does not demonstrate how the evidence underlying the aggravated stalking conviction, for which he requested severance, was factually similar to the evidence supporting the aggravated burglary and first-degree murder convictions. Unlike our review of this factor in *Lovett*, we fail to see how the jury in this case might have confused the evidence of aggravated stalking with the evidence of aggravated burglary and murder. *See id.* ¶ 74 (highlighting the factual similarities between the two murders, as evidenced in the State's comment in closing argument that "[t]here is no question *in these two cases* these women were deliberately murdered" and that "the amount and the type of injuries that *they* suffered can lead to no other conclusion" (alteration in original)). For this reason, we conclude that the aggravated stalking offense was not similar to the remaining offenses.

**{18}** Fourth, Defendant asserts that the offenses were "inflammatory." All crimes may be characterized as somewhat inflammatory. In this case, Defendant does not articulate why we should consider the charged offenses to be especially inflammatory, so we decline to consider this factor in our analysis of actual prejudice.

**{19}** Fifth, Defendant claims that the trial was unusually long and complex. We disagree. Defendant's jury trial spanned three days and included testimony of nineteen witnesses, including expert scientific testimony. Contrasted with other criminal trials, which may last several weeks or longer depending on the circumstances, we consider Defendant's trial to have been manageable. For example, in *Lovett*, the defendant's trial lasted "two full weeks" and the jury was tasked with reviewing copious evidence of "two death-penalty-eligible murders . . . involv[ing] two unrelated victims, different defenses, dozens of witnesses, and a significant amount of expert testimony." 2012-NMSC-036, ¶ 75. We observed in that case that "[t]he fact that the State was confused at times, using the wrong victim's name, indicating the wrong jury instruction, and confusing the locations where the victims were found, suggests that the jury was also confused at times." *Id.* There is no indication that the length and complexity of Defendant's trial resulted in juror confusion or difficulty in keeping track of the evidence that supported each of the joined offenses. Therefore, this factor does not demonstrate actual prejudice to Defendant.

**{20}** Finally, Defendant argues that the evidence supporting the murder charge "was fairly weak." He also asserts that he was actually prejudiced by joinder because "the jury convicted despite [Defendant's] alibi evidence." Again, we disagree. We note once more that Defendant did not challenge the sufficiency of the evidence to support the murder conviction in his appeal. This suggests that the evidence supporting this conviction was not "thin." *See Lovett*, 2012-NMSC-036, ¶ 56. Furthermore, the jury had a fair opportunity to observe and listen to Defendant's testimony in which he detailed his version of events on the morning of Victim's death. The jury then judged the testimony and weighed the credibility of the evidence. "New Mexico appellate courts will not invade the jury's province as fact-finder by second-guess[ing] the jury's decision concerning the credibility of witnesses." *See Garcia*, 2011-NMSC-003, ¶ 5 (alteration in original) (internal quotation marks and citation omitted). Defendant fails to show how the jury's rejection of his alibi supports a determination that he was actually prejudiced by the joinder of his offenses.

**{21}** Having assessed each of Defendant's claims on this issue, we conclude that Defendant failed to meet his burden to show that he was actually prejudiced by the district court's denial of his motion to sever. In further support of this conclusion, we proceed to address whether the evidence of Defendant's pattern of harassing behavior was cross-admissible to prove each of the charged offenses.

### 3. The evidence was cross-admissible

**{22}** If the evidence of one offense is also admissible to prove the elements of the other joined offenses, "then any inference of prejudice is dispelled and our inquiry is over." *See Gallegos*, 2007-NMSC-007, ¶ 20. Evidence is cross-admissible if it would

have been admissible in a separate trial for each of the charged crimes. *See Lovett*, 2012-NMSC-036, ¶ 11. Undoubtedly, the evidence of a "pattern of harassing conduct"—including Defendant's prior misdemeanor conviction—would have been admissible in a trial on only the aggravated stalking charge. *See* NMSA 1978, § 30-3A-3(A) (2009) (defining stalking as "knowingly pursuing a pattern of conduct, without lawful authority, directed at a specific individual when the person intends that the pattern of conduct would place the individual in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint of the individual or another individual"). To determine if this evidence is cross-admissible, we must determine whether it would also be admissible in separate trials for aggravated burglary and murder.

**{23}** In its order denying Defendant's motion to sever, the district court ruled that the evidence of an "alleged pattern of conduct by the defendant is cross-admissible and not unfairly prejudicial." The district court rested its ruling on Rule 11-404(B) NMRA. Under that rule, "[e]vidence of a crime, wrong, or other act . . . may be admissible [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Applying Rule 11-404(B), the district court explained that

> [i]n this case, aggravated stalking is a continuing offense that is alleged to have culminated in the death of the victim. . . . The pattern of conduct alleged by the [S]tate is not being used to show conformity, but to demonstrate that [D]efendant had the motive, intent, [or] plan to commit the allegations.

In other words, the evidence of Defendant's pattern of harassing conduct would have been admissible to prove Defendant's motive, intent, or plan to commit the aggravated burglary and murder. We agree with the district court's assessment of the evidence under Rule 11-404(B). We therefore conclude that the evidence was cross-admissible. Thus, Defendant was not actually prejudiced by the district court's refusal to sever the offenses for trial. *See Gallegos*, 2007-NMSC-007, ¶ 20. For the foregoing reasons, we decline to reverse Defendant's convictions based on the denial of his motion to sever. We proceed to Defendant's third argument concerning evidence authentication.

## C.    Foundational Testimony Sufficiently Authenticated the Surveillance Video

**{24}** Next, Defendant argues that the district court improperly admitted video surveillance footage from Victim's house, which depicted a person dressed in all black, without shoes, entering through the back of the house on the morning of Victim's death. The district court admitted the surveillance video based on the authentication testimony of Captain Valdez and Victim's daughter, who lived at Victim's house and had independent access to the surveillance recordings. Defendant asserts that this evidence was not properly authenticated. "In general, we review a trial court's admission or exclusion of evidence for abuse of discretion. An abuse of discretion arises when the evidentiary ruling is clearly contrary to logic and the facts and circumstances of the case." *State v. Marquez*, 2016-NMSC-025, ¶ 33, 376 P.3d 815 (internal quotation marks and citation omitted); *accord State v. Imperial*, 2017-NMCA-040, ¶¶ 14, 27-34, 392 P.3d 658. Based on the following analysis under this standard of review, we conclude that

the district court did not abuse its discretion in admitting the surveillance video because this evidence was sufficiently authenticated.

**{25}** The proper authentication of evidence for admission at trial is governed by Rule 11-901(A) NMRA. Under that rule, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." When the evidence is a photograph or video "created through [an] automated process[,]" New Mexico courts recognize a "low bar for authentication." *Imperial*, 2017-NMCA-040, ¶ 29. "Such photographic [or video] evidence is admissible under the 'silent witness' theory[.]" *Id.* Under the silent witness theory, "the photographic [or video] evidence is a 'silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness." *State v. Henderson*, 1983-NMCA-094, ¶ 8, 100 N.M. 260, 669 P.2d 736. However, a proponent of photographic or video evidence must still lay a proper foundation. "The evidence must be authenticated. A witness with knowledge must testify that the thing is what it purports to be." *Id.* ¶ 11.

**{26}** In *Henderson*, the Court of Appeals concluded that photographic evidence was properly admitted under the silent witness theory when an officer familiar with the machine used to develop film "testified about the film developing procedure" and stated that she had requested the development of the film for the date in question. *Id.* ¶ 12. Likewise, in *Imperial*, the Court of Appeals determined that video footage was properly admitted under the silent witness theory when a police officer testified that a "surveillance video was downloaded in response to his request for recordings of specific dates and times" from the cache of surveillance recordings at the store where the crimes occurred. 2017-NMCA-040, ¶¶ 3, 31. A proper foundation was further supported by the testimony of a store employee that

> (1) the images on the surveillance video were from the [store] location at which she works, (2) the date and time information is programed remotely, (3) local employees do not have the ability to manipulate that information, and (4) she is able to download surveillance video from specific dates and times for up to ninety days.

*Id.* ¶ 31. All of this amounted to a sufficient foundation to admit the surveillance footage under Rule 11-901. *Id.* ¶¶ 31, 34.

**{27}** In this case, similar to *Henderson* and *Imperial*, witnesses with knowledge of the video evidence testified about the authenticity of the evidence. Victim's daughter testified that her mother had previously contracted with Vivint to provide a three-camera security system at their house. Each camera offered a live-stream twenty-four hours a day that she could view through the Vivint mobile application (Vivint App) on her cellphone. The cameras were also equipped with a sensor and were enabled to activate and record if the sensor detected any movement. Victim's daughter received notification when the automated system made a recording, and she could access and view the recorded video files according to their dates and times.

**{28}** Victim's daughter further testified that she had tested the operation of the automated system and confirmed that the cameras activated and recorded as intended. She conducted this test by moving around the house and reviewing the videos that the system recorded. Although Victim's daughter could access, view, and save the video files, the Vivint App did not allow her to edit or alter the films or their time codes. Concerning the authentication of the specific video file at issue, Victim's daughter testified that she downloaded and viewed the file in the Vivint App upon receiving notification that the system had created a recording after detecting movement in the house on the day of her mother's death. The video footage included an image of an unidentified person walking into the back of the house at 8:19 in the morning. Victim's daughter saved the video file and provided it to law enforcement.

**{29}** Captain Valdez also testified about the reliability of the surveillance video. He stated that during his investigation, he requested that Vivint preserve all video surveillance for the day before and the day of Victim's death. After receiving a search warrant, Vivint provided Captain Valdez with a time-sensitive, password-secured link, which allowed him to access and download the recorded surveillance video files of Victim's house for the specified dates. The video files were provided in a manner that would not allow Captain Valdez to alter or otherwise edit the files. Captain Valdez also received instructions from Vivint on how to read the video time stamps and accompanying time logs so that he could use the logs and video files to locate a recording made on a specific date and time. Finally, during Captain Valdez's foundational testimony, he was questioned as to whether the video recordings accorded with his observations at Victim's house during his investigation. Captain Valdez responded that in the video recordings he reviewed from the morning of Victim's death, Victim was recorded wearing the same shirt she was wearing when Captain Valdez observed her body during the homicide investigation.

**{30}** Relying on the testimony of Captain Valdez and Victim's daughter, the district court admitted the video surveillance recordings under the silent witness theory. To authenticate the recorded video files, the State was required to meet the "low bar" that "a witness with knowledge [could testify] that the thing is what it purports to be." *Imperial*, 2017-NMCA-040, ¶ 29 (internal quotation marks and citation omitted). We agree with the district court that the State satisfied this requirement during its examination of Victim's daughter and Captain Valdez. For this reason, the district court's evidentiary ruling was not "contrary to logic [or] the facts and circumstances of this case." *Marquez*, 2016-NMSC-025, ¶ 33 (internal quotation marks and citation omitted). Therefore, we conclude that the district court did not abuse its discretion by admitting the recorded video surveillance footage. The final question before us in this case is whether Defendant's convictions violate the principles of double jeopardy.

## D.    Defendant was Sentenced in Violation of the Double Jeopardy Clause

**{31}** Defendant argues that his sentences for aggravated stalking, aggravated burglary, and first-degree, willful and deliberate murder violate the prohibition of multiple punishments for the same offense under the Double Jeopardy Clause of the federal constitution, incorporated to the states through the Fourteenth Amendment. U.S. Const.

amend V ("No person shall . . . for the same offense . . . be twice put in jeopardy of life or limb."); *Benton v. Maryland*, 395 U.S. 784, 794 (1969). Defendant claims that the State impermissibly relied on his singular act of killing Victim to prove certain elements of all three offenses for which he was convicted and sentenced. In particular, he draws attention to the State's closing argument, in which the prosecutor asserted that Defendant's murderous act proved both the battery element of aggravated burglary and the "reasonable apprehension of death or bodily harm" element of aggravated stalking. Defendant's argument alleges a "double-description" violation of double jeopardy, which we review de novo. *State v. Torres*, 2018-NMSC-013, ¶¶ 16-17, 413 P.3d 467.

{32}    A double-description violation occurs when "a defendant is convicted under different statutes but the same criminal conduct is the basis underlying the multiple charges." *Id.* ¶ 16. Our analysis of double-description claims proceeds in two steps. First, we must determine "whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates multiple statutes." *State v. Sena*, 2020-NMSC-011, ¶ 45, 470 P.3d 227 (alteration omitted) (quoting *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223)*.* If we conclude that the same conduct violated more than one statute, we then ask "whether the [L]egislature intended to create separately punishable offenses" under the pertinent statutes. *Sena*, 2020-NMSC-011, ¶ 45 (quoting *Swafford*, 1991-NMSC-043, ¶ 25). In our ensuing analysis, we consider first whether Defendant's convictions of aggravated burglary and first-degree murder lead to a double-description violation before turning to Defendant's conviction of aggravated stalking.

## 1.    Aggravated burglary and first-degree, willful and deliberate murder

{33}    Defendant argues that his convictions of aggravated burglary and first-degree murder violate double jeopardy because he was punished under both statutes for one course of conduct. Specifically, he asserts that the act of killing Victim was unconstitutionally used twice to prove both an essential element of first-degree murder and the aggravating element of aggravated burglary. We agree. As we explain herein, we conclude that Defendant's conduct underlying both convictions was unitary and that the Legislature did not intend to permit multiple punishments under the facts and legal theory of this case. We begin with an analysis of unitary conduct.

## a.    Unitary conduct

{34}    To determine whether the conduct underlying each offense was unitary, we must analyze "whether or not a defendant's acts are separated by sufficient 'indicia of distinctness.'" *Torres*, 2018-NMSC-013, ¶ 18 (quoting *DeGraff*, 2006-NMSC-011, ¶¶ 26-27). Identifying sufficient indicia of distinctness requires consideration of the following factors: "whether acts were close in time and space, their similarity, the sequence in which they occurred, whether other events intervened, and the defendant's goals for and mental state during each act." *State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104. Centering our analysis around these factors, we "look[] for an identifiable point at which one of the charged crimes had been completed and the other not yet committed." *Torres*, 2018-NMSC-013, ¶ 19 (internal quotation marks and citation

omitted). To conduct this analysis, we review "the elements of the charged offenses . . . and the instructions given to the jury" to establish the scope of the prohibited conduct under each statute. *Sena*, 2020-NMSC-011, ¶ 46. We then evaluate the factual evidence at trial to determine whether the defendant's conduct was sufficiently distinct to support a separate conviction of each offense. *See id.* ¶¶ 46, 54-55.

**{35}** In reviewing the elements of the charged offenses, we observe that both crimes require an unlawful touching. First-degree murder under Section 30-2-1(A)(1) requires "the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing[.]" The jury was instructed on this charge in accordance with these statutory elements. Aggravated burglary, as charged against Defendant, requires a defendant to commit a battery in the course of committing a burglary. *See* § 30-16-4(C). In other words, to convict on aggravated burglary in this case, the jury was required to find the essential elements of simple burglary in addition to the essential elements of simple battery. The crime of simple "[b]urglary consists of the unauthorized entry of any . . . structure . . . with the intent to commit any felony or theft therein." NMSA 1978, § 30-16-3 (1971). The crime of simple "[b]attery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner." NMSA 1978, § 30-3-4 (1963). We note that Defendant was not charged with simple burglary or simple battery, but only with the amalgamation of the two offenses in the crime of aggravated burglary. The jury instruction on aggravated burglary reflected the statutory elements of both burglary and battery:

> For you to find [D]efendant guilty of aggravated burglary as charged in Count 2, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
> 1. [D]efendant entered a dwelling without authorization;
> 2. [D]efendant entered the dwelling with the intent to commit first degree murder or second degree murder once inside;
> 3. [D]efendant touched or applied force to [Victim] in a rude or angry manner while entering or leaving, or while inside;
> 4. This happened in New Mexico on or about the 20th day of July, 2016.

**{36}** With these elements and instructions in mind, we review the evidence presented at trial to determine whether Defendant's actions constituted two separate offenses or one course of criminal conduct. While Defendant relies on the State's legal theory as expressed in closing argument to demonstrate that he was punished for unitary conduct, we have explained that the prosecution's legal theory alone does not "necessarily determine[] whether conduct may be considered unitary." *Franco*, 2005-NMSC-013, ¶ 7. In this case, under a general verdict that does not identify specific conduct concretely tied to each conviction, "[t]he proper analytical framework is whether 'the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses.'" *Id.* (quoting *Swafford*, 1991-NMSC-043, ¶ 29). There is no question that the evidence in this case supports the jury's finding that Defendant committed multiple batteries during his attack on Victim. The

question is whether Defendant's acts of battery were distinct from his act of murder. Answering this question requires a thorough examination of the evidence presented to the jury.

**{37}** The jury learned that Victim died of asphyxia caused by neck compression and drowning and that the manner of death was homicide. During trial, the medical examiner identified injuries to Victim's eyes, neck, shoulders, and head. Victim displayed hemorrhaging in the small vessels of her eyes, which supported the conclusion that she was strangled. She suffered internal injury to the muscles of her neck and multiple abrasions to her neck and shoulders. Victim also had several spots of severe bleeding under her scalp, indicating blunt force trauma. According to the medical testimony, the blunt force trauma was the result of direct blows to her head and the ripping out of a significant mass of hair. The medical examiner further explained that drowning contributed to the death because Victim's lungs contained excess fluid, and Victim was found with standing water in her mouth with her head positioned below the bathtub faucet.

**{38}** Our indicia of distinctness analysis requires us to scour this evidence for an inflection point in Defendant's conduct—a moment at which the act of battery was completed before the act of killing had begun. *See Torres*, 2018-NMSC-013, ¶ 19. For example, in *DeGraff*, after attacking a homeowner during a break-in, the defendant was convicted of aggravated burglary with battery as the aggravating factor. 2006-NMSC-011, ¶¶ 1, 3, 28-30. Because the defendant ultimately killed the victim, he was also convicted of felony murder. *Id.* ¶¶ 1, 30. Like Defendant in this case, the defendant in *DeGraff* argued that his dual convictions constituted a double-description violation of double jeopardy. *Id.* ¶ 26. The Court disagreed, concluding that the defendant's conduct was not unitary because the defendant had used several types of weapons to inflict two different modes of attack, and forensic evidence indicated an "intervening struggle" between the initial battery and the subsequent killing. *Id.* ¶¶ 3, 30. In other words, the evidence showed that the aggravated burglary was complete before the murder was committed.

**{39}** Similarly, in *State v. Foster*, the Court held that the defendant's convictions of kidnapping and felony murder did not violate double jeopardy. 1999-NMSC-007, ¶¶ 31-35, 126 N.M. 646, 974 P.2d 140 (*abrogated on other grounds as recognized in Sena*, 2020-NMSC-011, ¶¶ 47-53). The Court explained that the defendant's conduct was not unitary because different weapons were used to commit each offense and the completion of each offense was separated by "several minutes." *Foster*, 1999-NMSC-007, ¶ 31. The defendant's conduct consisted of two distinct offenses because he first used one weapon to kidnap the victim by knocking her unconscious before using a different weapon to kill the victim by strangling her. *Id.* Similar to the sequence of criminal conduct in *DeGraff*, the kidnapping in *Foster* was complete before the act of murder began.

**{40}** This reasoning is consistent with the Court's additional and inverse conclusion in *Foster* that a defendant's conduct is unitary if the same weapon was used to commit both offenses, and "[t]he evidence . . . does not show a significant separation in time or

physical distance" between two acts. *Id.* ¶¶ 38-40. Accordingly, the *Foster* Court found a double jeopardy violation where the defendant's single act of strangling the victim with an extension cord was used to prove an essential element of both the armed robbery conviction and the felony murder conviction. *Id.* ¶¶ 37-38. On the facts of that case, the Court concluded that "the elements of armed robbery [were] subsumed within the elements of first degree felony murder." *Id.* ¶ 40. Put another way, the jury could have found that the armed use of force required to prove armed robbery was the same use of force that killed the victim. A conviction and sentence based on such a finding is a double-description violation of the Double Jeopardy Clause. *See id.* ¶¶ 39-40.

{41}    Applying this precedent to our review of the evidence supporting Defendant's aggravated burglary and first-degree murder convictions, we conclude that Defendant's conduct was unitary. Under the facts presented, the jury could not have "reasonably . . . inferred independent factual bases" for the aggravated burglary and first-degree murder convictions. *Franco*, 2005-NMSC-013, ¶ 7 (internal quotation marks and citation omitted). This is because Defendant's acts of battery cannot be separated from his act of murder. Victim's multiple head, neck, and shoulder injuries are consistent with the type of prolonged death Defendant inflicted on Victim by strangling and drowning her. These injuries reflect Defendant's singular "goal[] . . . and mental state" to kill Victim with his bare hands; they do not support an independent finding that Defendant committed a distinct battery before proceeding to commit this type of murder. *See id.*

{42}    Comparison to the distinct conduct in *DeGraff* and *Foster* reveals the lack of sufficient indicia of distinctness in this case. Unlike our reasoning in those cases, we cannot rely on the number of weapons to distinguish Defendant's conduct because Defendant's only weapons were his two hands. Likewise, the evidence does not show that there was a period of time or an intervening struggle between the start of Defendant's ambush and the final moments of Victim's life. Finally, the evidence suggests that Defendant's fatal attack took place in only one room—the bathroom—so there is no indication that Defendant battered Victim in a different physical space from that where he killed her. Overall, we cannot identify a moment at which the aggravated burglary was complete and the murder had yet to begin. *See Torres*, 2018-NMSC-013, ¶¶ 19-20. Because Defendant's conduct cannot be distinguished by sufficient indicia of distinctness, we conclude that Defendant was punished twice for the unitary conduct of killing Victim. Accordingly, we turn to the second prong of our double-description analysis to determine whether the Legislature intended multiple punishments under both statutes.

### b.    Legislative intent to permit multiple punishments

{43}    Since Defendant's unitary conduct was the basis for his convictions of both aggravated burglary and first-degree, willful and deliberate murder, we must decide whether "the Legislature intended to punish the crimes separately." *Torres*, 2018-NMSC-013, ¶ 21 (alterations, internal quotation marks, and citation omitted). We first consult the plain language of the statute. *Id.* "If the Legislature clearly authorized multiple punishments[,] the analysis is over, and there is no double jeopardy violation." *Id.* We agree with both parties to this case that the plain language of the statutes does

not explicitly authorize multiple punishments. *See* Sections 30-16-4(C) (aggravated burglary), 30-2-1(A) (first-degree murder).

**{44}** In the absence of explicit authorization for multiple punishments, "we apply canons of construction to determine legislative intent." *Torres*, 2018-NMSC-013, ¶ 21. Chief among these canons of construction in our double jeopardy jurisprudence is the modified *Blockburger* test, derived from the United States Supreme Court's test in *Blockburger v. United States*, 284 U.S. 299 (1932). *State v. Porter*, 2020-NMSC-020, ¶ 17, 476 P.3d 1201. The original *Blockburger* test requires a comparison of the statutes at issue to assess whether "one statute 'requires proof of a fact which the other does not.'" *Id.* (quoting *Blockburger*, 284 U.S. at 304). This is a strict elements analysis, which permits multiple punishments if there is at least one criminal element unique to each statute. Application of a strict *Blockburger* analysis in this case would suggest that the Legislature intended separate punishments for Defendant's conduct because there are elements of each offense that are not required of the other. For instance, the aggravated burglary statute requires unauthorized entry of a dwelling, which the first-degree murder statute does not. *Compare* Section 30-16-4(C) *with* Section 30-2-1(A). In turn, the first-degree murder statute requires a killing of a human being, which is not required to prove aggravated burglary. *Compare* Section 30-2-1(A) *with* Section 30-16-4(C). However, this conclusion is not dispositive of our legislative intent analysis because New Mexico appellate courts have modified the traditional *Blockburger* test "to be more in line with the subsequent development of United States Supreme Court precedent." *Porter*, 2020-NMSC-020, ¶ 18 (alterations, internal quotation marks, and citation omitted); *see Torres*, 2018-NMSC-013, ¶ 25 ("[O]ur law does not permit an application of *Blockburger* that is so mechanical that it is enough for two statutes to have different elements." (internal quotation marks and citation omitted)).

**{45}** Under our modified *Blockburger* test, "we consider the state's legal theory of the case applied to the statutes at issue to determine the elements of each offense the defendant committed." *Porter*, 2020-NMSC-020, ¶ 18. In other words, the state's allegations of how the defendant violated each statute informs our determination of whether the Legislature intended multiple punishments under the alleged circumstances. *See id.* To ascertain the state's legal theory, we look first to "the statutory language, charging documents, and jury instructions used at trial." *Id.* ¶ 19. After consulting these sources, if doubt remains as to the state's legal theory, "we also review testimony, opening arguments, and closing arguments to establish whether the same evidence [was used to support] a defendant's convictions under both statutes." *Id.* We then return to the elements of the crimes as alleged by the state and ask whether "one of the offenses subsumes the other." *Id.* ¶ 20. If so, we conclude that the Legislature did not intend multiple punishments, and we find a violation of double jeopardy. *Id.* (quoting *Swick*, 2012-NMSC-018, ¶ 27).

**{46}** To identify the State's legal theory of how Defendant committed aggravated burglary, we start with the statutory language. Section 30-16-4 contains several alternatives for completion of the offense. To commit aggravated burglary, the defendant must gain "unauthorized entry of any [structure, including a dwelling], with intent to commit *any* felony or theft therein" and the defendant must either be armed at

some point during the burglary or must "commit[] a battery upon any person while in [the structure] or in entering or leaving [the structure]." Section 30-16-4 (emphasis added). In this case, the State charged Defendant with aggravated burglary on the allegation that he entered Victim's dwelling with the requisite intent to commit a felony therein and then "committed a battery upon [Victim] while in said place or while entering or leaving said place."

**{47}** The jury instruction on this count provided additional clarity to the State's legal theory of how the *intent* element was met, but it did not provide clarity as to the State's theory of how the *battery* element was met. Pertinent to our analysis, the jury was instructed that to convict on aggravated burglary, the State must prove beyond a reasonable doubt that "[D]efendant entered the dwelling with *the intent to commit first degree murder or second degree murder* once inside[,]" and that "[D]efendant touched or applied force to [Victim] in a rude or angry manner while entering or leaving, or while inside[.]" Neither the charging document nor the jury instruction identify the specific touching that would support a finding of the battery element of the crime. Therefore, we must consider the State's arguments to the jury in light of the testimony at trial to ascertain the State's theory as to how Defendant committed battery.

**{48}** Once we consider the State's closing argument, it is clear that the State relied on the *act of murder* to prove the battery. In explaining the aggravated burglary instruction to the jury, the State asserted, "Clearly he touched her in a rude or angry manner because he murdered her." This reveals that the State's legal theory was that Defendant committed aggravated burglary when he killed Victim and not at any point before.

**{49}** When comparing the elements of the statutes under the State's theory, the first-degree murder statute does not contain an element that the aggravated burglary statute does not. To convict Defendant of first-degree, willful and deliberate murder, the jury would have to find that Defendant killed Victim with the deliberate intention to take away her life. *See* Section 30-2-1(A). The following jury instruction, altered to incorporate the State's legal theory, demonstrates that all the elements of first-degree murder were subsumed in the elements of aggravated burglary in this case. To convict Defendant of aggravated burglary, the jury was asked to find:

1. [D]efendant entered a dwelling without authorization;
2. [D]efendant entered the dwelling with the *intent to commit first degree murder* or second degree murder once inside;
3. [D]efendant touched or applied force to [Victim] in a rude or angry manner [*by killing Victim*] while entering or leaving, or while inside;
4. This happened in New Mexico on or about the 20th day of July, 2016.

**{50}** Since both elements of first-degree murder were required to convict Defendant of aggravated burglary, we cannot say that the Legislature intended separate punishments in this case. Based on the foregoing review of the State's legal theory and the evidence presented at trial, we conclude that Defendant's double jeopardy rights were violated when he was convicted and sentenced for first-degree murder and aggravated burglary.

As a result of this conclusion, we vacate Defendant's conviction of aggravated burglary, which carries a shorter sentence than that of first-degree murder. NMSA 1978, §§ 31-18-14 (2009), 31-18-15(A)(7) (2019); *see Torres*, 2018-NMSC-013, ¶ 28 ("When double jeopardy protections require one of two otherwise valid convictions to be vacated, we vacate the conviction carrying the shorter sentence.").

## 2. Aggravated stalking and first-degree, willful and deliberate murder

**{51}** We next address Defendant's argument that his convictions of aggravated stalking and first-degree, willful and deliberate murder also constitute a double-description violation of double jeopardy. Defendant claims that the State relied on the murder to prove that Defendant "intended to place [Victim] in reasonable apprehension of death or bodily harm[,]" which is one of the elements required to prove aggravated stalking. We start with an analysis of unitary conduct.

**{52}** Once again, we ask whether "the jury reasonably could have inferred independent factual bases for the charged offenses" of aggravated stalking and first-degree murder. *See Franco*, 2005-NMSC-013, ¶ 7 (internal quotation marks and citation omitted). The jury was instructed to find Defendant guilty of aggravated stalking if it determined beyond a reasonable doubt that (1) Defendant "committed the crime of stalking" and (2) "[a]t the time of the offense [Defendant] knowingly violated a permanent or temporary order of protection issued by a court." To convict on aggravated stalking, the jury was also required to find the essential elements of simple stalking. In pertinent part, the jury was instructed on those elements as follows:

> 1. [Defendant] maliciously pursued a pattern of conduct that would cause a reasonable person to feel frightened, intim[id]ated, or threatened on more than one occasion by:
>    a. following [Victim] in a place other than in the residence of [D]efendant, or;
>    b. placing [Victim] under surveillance by being present outside [her] residence, and/or vehicle, and/or places frequented by [her], or;
>    c. harassing [Victim]; [and]
>
> 2. [Defendant] intended to place [Victim] in a reasonable apprehension of death or bodily harm[.]

**{53}** The jury heard evidence to satisfy the first element of simple stalking. Trial testimony established that Defendant had been following Victim, surveilling her residence, and harassing her with phone calls and text messages. The jury also heard evidence to support the aggravating element that Defendant repeatedly violated the restraining order against him. The sole issue then is whether a sufficient independent factual basis, aside from the murder, supports the second element of simple stalking: that Defendant intended to cause Victim "a reasonable apprehension of death or bodily harm."

{54}    We conclude that there is sufficient evidence to prove this intent element without resort to any evidence of the murder. Defendant's intent to cause Victim to reasonably fear for her life or safety is clear from the testimony of Victim's mother, boyfriend, and daughter. Victim's mother testified that she would frequently see Defendant drive by Victim's house and this caused Victim to be "very nervous [and] afraid." Victim's boyfriend stated that he would "quite often" see Defendant's vehicle near Victim's house and that Victim was "very scared" and "worried" about Defendant, to the point that she did not like to spend the night alone. Victim's daughter testified similarly, explaining that her mother was "scared" of Defendant following the breakup and installed a surveillance system at their house due to those fears. The volume and consistency in the testimony of Victim's closest companions supports the jury's determination that Victim's apprehension was reasonable. Defendant's multiple violations of the restraining order and the frequency with which his vehicle was spotted near Victim's location supports a reasonable inference that Defendant intended to scare and threaten Victim. For this reason, we hold that Defendant's conduct was not unitary and that his convictions of aggravated stalking and first-degree murder do not offend the prohibition against multiple punishments under the Double Jeopardy Clause.

## III.    CONCLUSION

{55}    Based on the foregoing analysis, we conclude that Defendant received a fair trial, and we affirm his convictions of aggravated stalking and first-degree, willful and deliberate murder. Because Defendant was punished in violation of the principles of double jeopardy, we vacate his conviction and sentence for aggravated burglary. We remand to the district court for resentencing consistent with this opinion.

{56}    **IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**C. SHANNON BACON, Justice**

**JUDITH K. NAKAMURA, Justice, Retired,
Sitting by Designation**

**DAVID K. THOMSON, Justice (concurring in part and dissenting in part)**

**THOMSON, Justice (concurring in part, dissenting in part).**

{57}    I concur with the majority on all issues except the conclusion in Section II(D) that Defendant was sentenced in violation of the Double Jeopardy Clause. More specifically, I do not agree that Defendant's convictions for aggravated burglary and first-degree (willful and deliberate) murder were based on unitary conduct. Respectfully, in my view,

*Torres*, *DeGraff*, and *Foster* do not support the conclusion made by the majority herein. I would affirm all of Defendant's convictions because the evidence presented supports a determination that non-unitary conduct supports the convictions for aggravated burglary and first-degree (willful and deliberate) murder. Therefore, I dissent in part.

**DAVID K. THOMSON, Justice**